**HALLIBURTON COMPANY, Plaintiff,**

v.

**SCHLUMBERGER TECHNOLOGY CORPORATION, Defendant.**

Civ. A. No. H–85–5464.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 19, 1989.

Fay E. Morisseau, Vinson & Elkins, Houston, Tex. and Joel M. Freed, Burns, Doane, Swecker & Mathis, Alexandria, Va., for plaintiff.

Ronald L. Palmer, Baker & Botts, Mitchell Lukin and Sylvia Matthews Egner, Houston, Tex., Richard G. Berkley, and Dana M. Raymond, Brumbaugh, Graves, Donohue & Raymond, New York City, for defendant.

## MEMORANDUM AND ORDER

LAKE, District Judge.

This is an action for patent infringement brought by Halliburton Company against Schlumberger Technology Corporation. The issue addressed in this memorandum is whether the Halliburton patents in suit are unenforceable because of inequitable conduct in their prosecution.

## I. BACKGROUND

### A. *The Industry and Art*

Both parties are leaders in oil well logging technology. Well logging involves lowering complex instrument packages called "sondes" or "tools" into well holes to measure properties of the earth surrounding the borehole. The type of logging at issue is known as thermal neutron decay logging. Neutron well logging tools emit fast, high energy, neutrons. Because of collisions with nuclei of atoms in the borehole and the surrounding earth formation these fast neutrons quickly lose energy and slow (are moderated) to a "thermal" energy at which they can then be captured by the nuclei of surrounding atoms. When this capture or "neutron decay" occurs, the capturing atoms emit gamma rays that can be detected by instruments in the tool. Measurements of gamma ray emissions are typically made as the tool moves continuously through the borehole. A tool of this type is depicted below from Figure 1 of the Halliburton '444 patent in suit.

FIG. 1

Because atoms of different materials capture thermal neutrons at different rates, interpretation of the rate of neutron capture from gamma ray emission data can disclose information about the formations around a well logging tool. The neutron decay rate can be plotted semi-logarithmically as a decay curve, such as that shown below from the first page of the Halliburton '444 patent.

The type of thermal neutron decay logging at issue in this suit is conducted in "closed" boreholes in which casing has been installed and cemented after drilling. Although thermal neutron decay tools have been used in closed hole logging since the mid–1960's, early tools all had a common problem that limited their value—they were not able to account for neutron decay occurring within the borehole itself. Thermal neutrons are captured, and gamma rays emitted, not only by nuclei of the surrounding earth formation, but also by nuclei of the metal well casing and the cement that secures it in the borehole and by nuclei of water, oil, gas, air, and other materials in the borehole. Measurement of composite data from this combined gamma ray population therefore reflects a mixture of the decay rate of the formation and the borehole.

When early thermal neutron decay logging tools were introduced no method was known for separately measuring gamma ray data associated with borehole neutron decay, i.e., for separating composite data into its borehole decay and formation decay components. In order to measure formation decay, early commercial tools delayed counting incoming gamma rays until after sufficient time had elapsed that it was assumed that the borehole component of decay had largely been dissipated. In the industry this procedure was known as "timing out the borehole." In many instances, however, it was recognized that calculating the separate borehole decay rate could be useful, for example to determine the presence of oil, gas, air or water in the borehole and to detect gaps in cement around casing. In addition, waiting until all gamma rays from borehole decay had dissipated denied earlier access to gamma rays

from formation decay since both borehole decay and formation decay occurred during the early period following a neutron burst. (See graph from '444 patent above).

The Halliburton patents in suit and the Schlumberger tools that allegedly infringe them improve on prior commercial tools by simultaneously measuring and separating both the borehole decay and the formation decay components. This information is typically expressed as the borehole decay time or "tau" ("$\tau$B") and the formation decay time ("$\tau$F").

### B. *History of This Litigation*

In September of 1985 Halliburton filed this action alleging that Schlumberger had infringed five Halliburton patents:

(1) Patent No. 4,326,129 issued on April 20, 1982 (the "Neufeld '129 patent");

(2) Patent No. 4,503,328 issued on March 5, 1985 (the "Neufeld '328 patent"); [1]

(3) Patent No. 4,388,529 issued on June 14, 1983 (the " '529 patent");

(4) Patent No. 4,409,481 issued on October 11, 1983 (the " '481 patent"); and

(5) Patent No. 4,424,444 issued on January 3, 1984 (the " '444 patent").

The first two patents are referred to as the "Neufeld patents." The other three are collectively referred to as the "Halliburton patents" or "patents in suit." Halliburton alleged that Schlumberger infringed these patents with well logging tools and services that Schlumberger identified by the designation "TDT–MB" and "TDT–P."

Schlumberger alleged that Halliburton was precluded from enforcing the patents in suit because of inequitable conduct in prosecuting them before the Patent and Trademark Office and counterclaimed that Halliburton's own TMD tool infringed certain Schlumberger patents. In July of 1987 when the original Joint Pretrial Order was filed, Halliburton abandoned its claims that Schlumberger had infringed the Neufeld patents. Earlier this year the Court ordered that the issue of inequitable con-

duct be severed from the other issues in the case and tried first. Schlumberger then dismissed with prejudice its counterclaims. The issue of inequitable conduct was tried to the Court from August 7 to August 28, 1989.

## II. INEQUITABLE CONDUCT

### A. *The Duty of Disclosure*

■ Prosecuting a patent application in the U.S. Patent and Trademark Office ("PTO") is normally an *ex parte* procedure conducted in secret with no notice or information provided to competitors or the public until the patent has been approved for issuance. 35 U.S.C. § 122; 37 C.F.R. § 1.14; *A.B. Dick Co. v. Burroughs Corp.*, 617 F.Supp. 1382, 1394 (N.D.Ill.1985), *aff'd*, 798 F.2d 1392 (Fed.Cir.1986). To preserve the integrity of the patent process, the PTO must be able to rely on the disclosures and other statements of the applicant and his attorney. During the prosecution of a patent the applicant and his attorney therefore occupy a relationship of trust to the PTO and are obligated to exercise the highest standards of honesty, good faith and candor. 37 C.F.R. § 1.56(a); *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1538 (Fed. Cir.1984). The applicant and his attorney must disclose to the PTO "information they are aware of which is material to the examination of the application." 37 C.F.R. § 1.56(a).

■ This high and absolute duty is "uncompromising" and extends throughout patent prosecution. *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381, *reh'g denied*, 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005 (1945). Applicants have a duty to disclose material information they become aware of at any time during the prosecution of a patent application. Manual of Patent Examining Procedures ("MPEP") §§ 2001.06 and 2002.03(a). Given the applicant's duty of good faith and candor and the *ex parte* nature of patent

---

**1.** Halliburton purchased the Neufeld '129 patent in April of 1983 and later prosecuted the Neu-    feld '328 patent as Neufeld's assignee.

application proceedings, any doubts about the inclusion of references to prior art in a patent application must be resolved in favor of disclosure. MPEP § 2004.10 (§ 2004.9 at the times in issue).

### B. *Violation of the Duty of Disclosure*

■ Inequitable conduct by the applicant or his attorney in dealings with the PTO may render a patent unenforceable. Inequitable conduct may consist of acts of omission—the failure to disclose material information—and acts of commission—the submission of false information. *J.P. Stevens & Co. v. Lex Tex. Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). If a court finds inequitable conduct by the applicant "all the claims—not just the particular claims to which the inequitable conduct is directly connected—are unenforceable." *Id.* at 1561. The reason for this rule was explained by the Supreme Court in *Precision Instrument:*

> In the instant case Automotive has sought to enforce several patents and related contracts. Clearly these are matters concerning far more than the interests of the adverse parties. The possession and assertion of patent rights are "issues of great moment to the public." (Citations omitted).

> A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope. The facts of this case must accordingly be measured by both public and private standards of equity.

324 U.S. at 816, 65 S.Ct. at 998.

■ Inequitable conduct is a broader concept than common law fraud. It is established by proof of facts by clear and convincing evidence of a threshold level of materiality of the nondisclosed or misrepresented information and a threshold level of intent to mislead the PTO. *J.P. Stevens,* 747 F.2d at 1560. If these threshold levels of proof are met, "the court must balance [materiality and intent] and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred." *Id.* The more material the omission, the less evidence of intent is required, and vice-versa. *N.V. Akzo v. E.I. DuPont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir. 1987); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (A greater showing of materiality may permit "a lesser showing of facts from which intent can be inferred ... sufficient to justify holding the patent invalid ..."). No single factor is dispositive. The determination is one of equity that is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Precision Instrument,* 324 U.S. at 815, 65 S.Ct. at 997; *accord, Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

### C. *Materiality*

#### (1) Standard

Although various standards of materiality have been articulated, the standard presently applied by the Federal Circuit is based on 37 C.F.R. § 1.56(a).

> "Inequitable conduct" requires proof by clear and convincing evidence of a threshold degree of materiality of the nondisclosed or false information. It has been indicated that the threshold can be established by any of four tests: (1) objective "but for"; (2) subjective "but for"; (3) "but it may have been"; and (4) PTO Rule 1.56(a), i.e., whether there is a substantial likelihood that a reasonable examiner would have considered the

omitted reference or false information important in deciding whether to allow the application to issue as a patent. *American Hoist,* 725 F.2d at 1362, 220 USPQ at 772–73. The PTO standard is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO. *American Hoist,* 725 F.2d at 1363, 220 USPQ at 773.

*J.P. Stevens,* 747 F.2d at 1559.

### (2) Materiality of prior art to patents in issue

#### (a) Type of art

■ "[P]rior art includes any relevant knowledge, acts, descriptions and patents which pertain to, but pre-date, the invention in question." *Mooney v. Brunswick Corp.,* 663 F.2d 724, 733 (7th Cir.1981). There is no requirement that prior art be embodied in a commercial application. *See* MPEP §§ 2001.04 and 2001.06; *Massachusetts Institute of Technology v. AB Fortia,* 774 F.2d 1104, 1008–09 (Fed.Cir.1985).

#### (b) Weight of prior art

■ The materiality standard of § 1.56(a) requires that a reasonable examiner would consider an undisclosed reference "important in deciding whether to allow the application to issue as a patent." To be material under this test, prior art need not anticipate the claimed invention or make it obvious under 35 U.S.C. § 103. *See Gardco Manufacturing, Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1214 (Fed.Cir. 1987). The fact that the claimed invention may be superior to withheld prior art may be a basis for patentability, but does not "serve automatically to render the withheld prior art either cumulative or immaterial." *Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1421 (Fed.Cir.1989). To be material the prior art need only be "within a reasonable examiner's realm of consideration." *Id.* at 1421.

■ The degree of materiality of prior art will vary according to its closeness to the invention claimed in the application. To the extent that undisclosed prior art includes "key" or "important" steps of a patent in issue, its materiality increases. *J.P. Stevens,* 747 F.2d at 1562–63. Conversely, evidence that uncited prior art is "less pertinent than or merely cumulative to prior art or information cited to or by the PTO" may rebut a claim of materiality. *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987). In considering materiality for purposes of determining inequitable conduct, the issue is whether there are similarities between the prior art and the patents in issue—not whether there are also differences. *J.P. Stevens,* 747 F.2d at 1562–63. Both claims and disclosures of the patent in issue must be compared to the disclosures of the uncited prior art to determine the materiality of the prior art for inequitable conduct purposes. *J.P. Stevens,* 747 F.2d at 1566.

The applicant's subjective belief of the invalidity of a prior patent does not prevent it from being material. *See Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984). On the other hand, testimony by the applicant's witnesses that prior art "would be pertinent for consideration" will establish materiality. *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.,* 759 F.2d 10, 14 (Fed.Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985).

### (3) Knowledge of the patent examiner as affecting materiality

■ Proof that the examiner *actually knew* of the undisclosed prior art in the sense that he "actually recalled [its] critical aspects," when examining the application in issue can preclude a finding of materiality. *J.P. Stevens,* 747 F.2d at 1563–64 and n. 10. A *possibility* that the examiner may have been aware of the art is a factor to be considered, but will not by itself preclude a finding of materiality. *Id.*

■ Where inequitable conduct is alleged there is no presumption that the examiner was aware of prior art in classes he searched but did not cite. *Driscoll v. Cebalo,* 731 F.2d at 885. Even where the alleged prior art patent was assigned to the same examiner as the patent in issue, there is no presumption that the examiner actually knew the other patent was material if it

was not cited to him in connection with the pending application. *J.P. Stevens*, 747 F.2d at 1563–64 and n. 10; *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 526–27 (Fed.Cir.1987).[2] A rule requiring such a presumption would dilute the applicant's duty of candor, would unfairly shift the burden of disclosure to the examiner, *see Armour & Co. v. Swift & Co.*, 466 F.2d 767, 779 (7th Cir.1972) ("[W]e think it is unfair to a busy Examiner no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a pending application."), and would be inconsistent with the PTO's own procedures. *See* MPEP § 2004.9 (§ 2004.8 at the times in issue).

### D. *Intent*

■ The threshold level of intent does not require evidence of deliberate scheming and need not be proved by direct evidence. *J.P. Stevens*, 747 F.2d at 1560. Direct proof of intent to mislead is difficult to obtain and is normally absent. *See Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1571 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Thus, "circumstantial evidence may permit an inference of intent." *Klein v. Peterson*, 866 F.2d 412, 415 (Fed.Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989). Intent may be proved "by showing acts the natural consequences of which [were] presumably intended by the actor." *J.P. Stevens*, 747 F.2d at 1560. While withholding a single piece of material prior art may suffice to establish inequitable conduct, a pattern or series of such omissions "clearly indicates a disdain for the administrative process that cannot be rationalized as an honest mistake, and such a pattern provides strong support for a ruling of inequitable conduct." *A.B. Dick*, 617 F.Supp. at 1396.

### (1) Actual knowledge

The applicant's knowledge of the existence and relevance of uncited prior art is a critical issue in determining his intent. *See FMC Corp. v. Manitowoc Co.*, 835 F.2d at 1415. Normally an applicant is only required to disclose material prior art of which he or his attorney is aware; not to conduct a prior art search and disclose art of which he could have been aware. *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d at 526 n. 6. However, if the applicant does conduct a search for prior art, or otherwise learns of it, his duty of disclosure is gauged by the prior art uncovered in that search.

### (2) Gross negligence

Intent may also be proved by evidence that the applicant was grossly negligent in failing to disclose prior art that he knew, or should have known, would be material to the PTO's consideration. *J.P. Stevens*, 747 F.2d at 1564; *Driscoll v. Cebalo*, 731 F.2d at 885. Gross negligence as used in this context is present if an applicant or his attorney, "judged as a reasonable person in his position, should have known of the materiality of a withheld reference." *J.P. Stevens*, 747 F.2d at 1560. Gross negligence may encompass the reasonableness of the applicant's alleged ignorance of both the existence and the materiality of prior art. Although gross negligence by the applicant may support a finding of intent to mislead, it does not compel such a finding. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 873, 876 (Fed.Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *J.P. Stevens*, 747 F.2d at 1566–67. The conduct amounting to gross negligence "must be sufficient to require a finding of deceitful intent in the light of all the circumstances.... including evidence indicative of good faith [by the applicant]." *Kingsdown*, 863 F.2d 873, 876.

---

**2.** *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1457 (Fed.Cir.1984), is not inconsistent with this analysis. There the copending applications before the same examiner were filed by the same agent. The Federal Circuit concluded that those facts could permit a finding of actual knowledge by the examiner since in that situation the examiner had a duty to know the contents of the copending applications "so as to be sure they claimed distinct inventions."

### (3) Good faith of the applicant

The applicant's good faith belief that he disclosed all known material prior art is relevant to his intent under both the actual knowledge and gross negligence analyses. Like any fact issue, a claim of good faith belief must be evaluated in light of the objective reasonableness of that belief under all of the circumstances. *See Argus Chemical,* 759 F.2d at 14–15; *Rohm & Haas,* 722 F.2d at 1571; *Norton v. Curtiss,* 433 F.2d 779, 795–96 (C.C.P.A.1970). Otherwise, " '[a] mere denial of intent to mislead ... would defeat every effort to establish inequitable conduct....' " *FMC Corp. v. Manitowoc Co.,* 835 F.2d at 1416. The weight to be afforded subjective intent will necessarily diminish as it becomes more and more unreasonable in light of all of the circumstances. *Id.* To measure the reasonableness of an applicant's professed good faith belief of immateriality, a trial court must determine if "an actor in applicant's position would have reasonably known that the reference was material." *Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1107 (Fed.Cir.1986), *quoting J.P. Stevens,* 747 F.2d at 1564; *accord, Argus Chemical,* 759 F.2d at 14–15.

Particularly relevant in evaluating evidence of subjective intent are the applicant's contemporaneous expressions regarding materiality before litigation arose. *See, e.g., J.P. Stevens,* 747 F.2d at 1565–66 (applicant's license of uncited patent "evinces knowledge of [its] importance"). Where contemporaneous evidence shows that the applicant appreciated the relevance of uncited prior art, his later claim of subjective good faith will not avoid a finding of intent to mislead. *Id.* at 1566–67.

Similar to an applicant's good faith denial of intent to mislead is his professed good faith ignorance of prior art. A claim of good faith ignorance of prior art must be assessed in light of the information available to the applicant of which he should have been aware. *FMC Corp. v. Hennessy Industries, Inc.,* 836 F.2d at 526 n. 6. Although an applicant is not presumed to know of the existence of all material prior art, *Kimberly–Clark Corp. v. Johnson &* *Johnson,* 745 F.2d 1437, 1454 (Fed.Cir. 1984), he cannot "cultivate ignorance." *FMC Corp. v. Hennessy Industries, Inc.,* 836 F.2d at 526 n. 6. Since an applicant's duty of disclosure is subject to a duty of reasonable inquiry, *see* MPEP § 2001.02, evidence that an applicant avoided knowledge of the existence or relevance of prior art may negate his attempt to assert subjective good faith as a defense to intent to mislead.

Although an applicant's good faith belief that uncited prior art was *not* material may rebut an inference of intent to mislead, his mistaken contemporaneous belief that uncited prior art *was* material cannot be rebutted by later proof that the art was not, in fact, material. This conclusion is compelled by the language of § 1.56(a), which links the applicant's duty of disclosure to his "awareness" and by the duties of candor and trust that underlie the rule. An applicant's failure to disclose art that his contemporaneous actions showed he believed to be material will permit an inference of intent to mislead notwithstanding his *post hoc* protestations of subjective good faith and immateriality. *See J.P. Stevens,* 747 F.2d at 1566–67.

### III. FINDINGS OF FACT AND CONCLUSION OF LAW

To assess the alleged inequitable conduct of Halliburton in failing to disclose prior art, it is necessary to compare the claims and disclosures of the Halliburton patents in suit with the prior art that Halliburton disclosed to the PTO and the additional prior art that Schlumberger contends Halliburton should have disclosed. Schlumberger alleges that Halliburton should have disclosed the following prior patents to the PTO:

(a) Patent No. 4,326,129 (the "Neufeld '129 patent");

(b) Patent No. 3,930,152, No. 3,940,-611, No. 3,940,613 and No. 3,979,300 (the "Texaco patents");

(c) Patent No. 3,164,720 and No. 3,256,438 (the "Armistead patents"); and

(d) Patent No. 3,733,486 and No. 4,002,904 (the "skip-a-beat patents").

Based upon the evidence in this case the Court makes the following findings of fact and conclusion of law.

### A. *General*

*Finding 1* Halliburton did not disclose any of the alleged prior art patents to the PTO. The disclosures of prior art in the "Prior Art" sections of the Halliburton '444, '481 and '529 patent applications are identical. None of the applications cite any references to prior art. Each discloses in general terms two commercial thermal neutron decay logging systems that were available when the applications were filed. Both systems timed out the borehole, which means that neither measured the entire neutron decay curve or determined a separate borehole decay component.

*Finding 2* The examiner cited six prior patents as references in the patents in suit, but did not cite any of the alleged prior art patents as references. All of the patents cited by the examiner timed out the borehole. None of them measured the entire neutron decay curve or determined a separate borehole decay component.

*Finding 3* The '529 patent (Defendant's Ex. 13) issued on June 14, 1983. The application for this patent (Defendant's Ex. 148) was filed in August of 1980. Notice of allowance was issued in April of 1982 listing six patents as references (Defendant's Ex. 148, pp. 42–44). Halliburton refiled this application on June 23, 1982, with broadened claims as a continuation application (Defendant's Ex. 149) and then abandoned the original application. No changes were made in the disclosure of prior art.

*Finding 4* The '481 patent (Defendant's Ex. 401) issued on October 11, 1983. The application for this patent (Defendant's Ex. 151) was filed in August of 1980. Notice of allowance was issued in March of 1982 listing six patents as references. Halliburton filed a continuation application on June 1, 1982, making certain changes to drawings (Defendant's Ex. 152) and then abandoned the original application. No changes were made to the disclosure of prior art.

*Finding 5* The '444 patent (Defendant's Ex. 14) issued on January 3, 1984. The application for this patent (Defendant's Ex. 150) was originally filed in August of 1980. Notice of allowance was issued in April of 1982 listing six patents as references. Halliburton filed a continuation application on July 1, 1982 (Defendant's Ex. 402), and then abandoned the original application. Minor changes were made to the claims, but no changes were made to the disclosure.

*Finding 6* The principal invention of the patents in suit is their method for measuring and simultaneously decomposing the entire neutron decay curve into the borehole and formation components by assuming that the decay curve is described by a two-exponential relationship. Other features of the invention are the use of repetitive emissions of relatively short bursts of fast neutrons, detecting the borehole and formation decay components in at least four subsequent time intervals or "gates," and detecting and correcting for background radiation. (See, e.g., Claims 1, 2 and 33 of the '444 patent).

*Finding 7* The two-exponential formula used to decompose the neutron decay curve is set out in Equation (4) of each patent in suit as follows:

$$C'(t) = Ae^{-t/\tau B} + Be^{-t/\tau F}$$

wherein $C'(t)$ is the background-corrected counting rate at any time $t$; $A$ and $B$ are the amplitudes of the borehole and formation components at $t=0$, respectively; and $\tau B$ and $\tau F$ are the borehole and formation decay times.

*Finding 8* Dr. Dan Arnold, Vice–President of Technology for Halliburton Logging Services, and one of the inventors of the '444 patent, testified that the most significant feature of the inventions in the patents in suit was the simultaneous measurement of $\tau B$ and $\tau F$. The titles and abstracts prepared by Halliburton for the patents in suit also emphasize this aspect of its claimed inventions.

### B. *The Neufeld '129 Patent*
#### (1) Materiality and knowledge

*Finding 9* The Neufeld '129 patent (Defendant's Ex. 9) issued on April 20, 1982,

on application No. 149,276, filed on May 12, 1980, as a continuation-in-part of application No. 904,591, filed on May 10, 1978.

*Finding 10* Like the patents in suit, the Neufeld '129 patent disclosed a means of improving on prior art. Neufeld disclosed measuring the entire decay curve and evaluating both the borehole and formation components of the decay curve by using a two-exponential formula. Equation (4) of the Neufeld '129 patent disclosed the same two-exponential formula to analyze the decay curve as equation (4) of the patents in suit. Neufeld also disclosed using relatively short bursts of neutrons to measure the decay curve.

Like the patents in suit, Neufeld also recognized the advantages of measuring the borehole component of the decay curve. The "timing out" prior art did not measure gamma rays until enough time had passed that it was presumed that gamma rays associated with borehole capture had dissipated. This technique was based on the assumption that borehole decay occurred more rapidly than formation decay. (See, e.g., Column 1, Lines 21–25, and Column 2, Lines 52–63, of the '529 patent, Defendant's Ex. 13). The assumption proved correct when, for example, there were drilling fluids in the borehole with a high chlorine content. In that situation, neutron decay occurred rapidly in the borehole, and gamma ray measurements made after the borehole had been timed out could yield useful information about the formation. When the borehole contained air, gas, fresh water or oil, however, neutron decay in the borehole was much slower, and gamma rays from borehole decay overlapped to a considerable degree those from formation decay. Since neither Neufeld nor the patents in suit rely on assumptions as to the relative borehole and formation decay times, both Neufeld and the patents in suit solve this problem. Their common solution provided the additional advantage of allowing the use of all available gamma ray data following a neutron burst.

*Finding 11* There are differences between the Neufeld '129 patent and the patents in suit: (1) Neufeld discloses random or pseudo-random neutron pulses, while the inventions claimed in the patents in suit use non-random pulses; (2) the inventions claimed in the patents in suit detect gamma rays between pulses during at least four subintervals after each pulse, while Neufeld does not detect gamma rays only between pulses and does not specify the number of subintervals during which gamma rays should be detected; and (3) after Neufeld detects gamma rays, it performs a correlation technique on the resulting data to derive a decay curve, while the patents in suit use raw gamma ray detection data to derive a decay curve.

*Finding 12* Halliburton learned of the Neufeld '129 patent no later than early July of 1982 after one of its in-house patent counsel, William J. Beard, read about it in the *Patent Office Official Gazette*. Beard was then prosecuting all of the continuation applications leading to the patents in suit. Between the time Halliburton learned of the Neufeld '129 patent and the issuance of the patents in suit, Halliburton believed that Neufeld disclosed the key feature of the inventions of the patents in suit. The evidence of this belief, which is summarized below, is inconsistent with Halliburton's litigation position that the Neufeld '129 disclosures were materially different from the inventions claimed in the patents in suit.

When Beard obtained and read the Neufeld '129 patent he realized that it disclosed the simultaneous calculation of $\tau$B and $\tau$F by means of a two-exponential formula. Dr. Arnold reviewed the Neufeld '129 patent and reported to the president of the Welex Division of Halliburton that the basic teachings of the Neufeld patent were close to the TMD tool that embodied the inventions of the patents in suit. As a result of that meeting Halliburton decided to purchase the Neufeld patent, not to obtain technology to use in its TMD tool, but to avoid having the Neufeld patent asserted against the TMD tool.

Contrary to Halliburton's litigation position that Neufeld is immaterial, in 1982 Beard recommended buying the Neufeld '129 patent because its disclosure was

broad enough to support claims that could cover the TMD tool. After receiving approval from senior Halliburton management, Beard became responsible for buying the patent from Neufeld. Beard employed an outside attorney to negotiate with Neufeld. Beard told the attorney that Halliburton was interested in the '129 patent because it was related to the TMD project. The attorney was instructed not to disclose Halliburton's identity to Neufeld until after an agreement had been reached to buy his patent rights. Halliburton approved hiring a private detective to investigate Neufeld to identify any vulnerabilities that could be exploited during these negotiations. Beard closely monitored dealings with Neufeld, kept Halliburton senior legal and management officials abreast of the investigation of Neufeld and negotiations with him, and urged Halliburton management to increase the amount it was willing to pay Neufeld.

When Halliburton purchased the Neufeld '129 patent on April 13, 1983, after months of negotiations, for $53,500.00, Beard traveled to Neufeld's home in Tennessee where he revealed Halliburton's interest in the patent and told Neufeld that Halliburton intended to file another application expanding Neufeld's original claims to cover the Halliburton TMD tool. On April 18, 1983, Beard wrote Neufeld a follow-up letter (Defendant's Ex. 130) stating:

> The object of this [application] will be to seek broader and more appropriate claim coverage based on your original disclosure to the Patent Office, of your multiple disclosed inventions. In this regard I am enclosing a Welex technical publication entitled "Thermal Multigate Decay Logging." This publication discloses in some detail the operation of the commercial Welex logging system for simultaneously measuring the borehole and formation components of thermal neutron decay time and macroscopic capture cross section. I would be interested in

obtaining your suggestions for suitable claim language, based on your original disclosure, of claims broad enough to read on such a system.

After drafting the new application, Beard sent a copy of it to Neufeld by letter dated May 10, 1983, "Re: Continuation Application to more fully cover disclosed inventions" (Defendant's Ex. 337) in which he explained that:

> The aim of this application is to provide more complete claim coverage on inventions disclosed but not claimed in your original May 10, 1978 patent application, now assigned to Halliburton.

On June 1, 1983, Beard filed on behalf of Neufeld an application using Neufeld's original disclosure, with greatly expanded claims, which ultimately led to the issuance on March 5, 1985, of patent No. 4,503,328 (Defendant's Ex. 10).

Beard testified that when he prepared the '328 application, at a time when all three of the patents in suit were still pending before the PTO, he concluded that the Neufeld '129 disclosure was broad enough to cover the measurement of count rate data in time gates and was broad enough to cover either a random or a periodic pulsed system. This testimony, and the '328 claims that Beard prepared,[3] are inconsistent with Halliburton's litigation position that the Neufeld '129 patent was immaterial to the patents in suit because of the different techniques it disclosed.

In December of 1984, when Halliburton was investigating the possibility of bringing this action, Beard wrote outside counsel "Re: Schlumberger TDT–MB Tool Vis-a-Vis Welex TMD Patents." (Defendant's Ex. 391). In that letter Beard stated: "At first blush it appears to me that claims in ... 4,326,129 ... can be read on the TDT–MB." Consistent with this belief Halliburton asserted both the Neufeld '129 and '328 patents against the Schlumberger TDT–MB

---

**3.** For example, Claim 1 of the '328 patent provides for generation of "a relatively short duration discrete burst of fast neutrons...." The same language appears in the Halliburton '529 patent in Claim 1, and similar language appears in Claim 9. Also, Claim 4 of the '328 patent provides for performing the detection steps "during the time intervals between said bursts of neutrons." This is similar to Claim 9 of the '529 patent, which requires "detecting ... during a time interval between said repetitive pulses of fast neutrons...."

system, which is not randomly pulsed, for almost two years in this action.

*Finding 13* Patent examiner David L. Willis examined the applications for the patents in suit during the same time frame that he examined the Neufeld '129 application and did not cite Neufeld as a reference in the patents in suit.[4] Willis performed update searches for the patents in suit after the Neufeld '129 patent issued and searched in classes and subclasses where Neufeld had been filed. However, none of the Halliburton applications cited Neufeld, and Willis testified that he did not recall being aware of Neufeld when he examined the Halliburton applications.

Given the workload of examiners, the number of patents filed in the common class and subclasses, and, in particular, the complexity of this art even to those intimately familiar with it, it is not reasonable to *assume* that Willis recalled the critical aspects of Neufeld when he examined the Halliburton applications. Had Halliburton desired to leave a clear record that Willis considered Neufeld (or any of the other alleged prior art patents), but rejected it as immaterial, it could have easily done so by citing Neufeld.[5] Since Halliburton failed to do so, this Court will not presume knowledge of Neufeld by Willis to extricate Halliburton from the present state of the evidence, which shows only a possibility of awareness by Willis, and therefore does not preclude a finding that Neufeld was material.

*Finding 14* The Neufeld '129 patent was very material to the applications that became the patents in suit. It disclosed the key feature of the patents in suit and was more material in this regard than the prior art cited by Halliburton and the six patents listed as references by the examiner. Furthermore, even if Neufeld were not in fact material, from no later than July of 1982

through the dates of issuance of the patents in suit Halliburton believed that the Neufeld '129 patent was very material to the inventions claimed in the patents in suit.

#### (2) Intent to mislead

*Finding 15* In this litigation Beard testified that he "did not give conscious consideration as to whether to cite or not cite the Neufeld patent during the prosecution of the Halliburton patents-in-suit." (Defendant's Ex. 138, para. 5). Beard also testified that he never intended to act inequitably toward the PTO. Even though Beard was involved after June of 1982 on a regular basis in dealings with the PTO concerning the continuation applications for the patents in suit, he did not disclose the Neufeld '129 patent to the PTO. Although Beard's affidavit (Defendant's Ex. 138) states that he knew the examiner handling the Halliburton applications had handled the Neufeld '129 patent, there was no testimony from Beard or any other witness that Halliburton believed or knew that Examiner Willis appreciated the significance of the Neufeld patent disclosures to the patents in suit.

*Finding 16* If, as he testified, Beard did not consciously consider whether to cite the Neufeld '129 patent, that failure, in light of all of the attendant circumstances, constitutes gross negligence because a reasonable person in Beard's position should have known of the materiality of Neufeld and disclosed it to the PTO. Beard's testimony that he did not intend to act inequitably toward the PTO is inconsistent with contemporaneous evidence discussed in Finding 12. That evidence establishes that after June of 1982 Halliburton, and Beard in particular, believed Neufeld to be material prior art. Under these circumstances a reasonable applicant would have realized, when it filed continuation applications in

---

4. Willis was also the assistant examiner on the Texaco '152 patent (Defendant's Ex. 5), which issued on December 30, 1975, and the '486 skip-a-beat patent (Defendant's Ex. 158), which issued on May 15, 1973. However, there was no evidence that Willis recalled being aware of either patent when he examined the patents in suit. The Court does not find that Willis' prior

involvement with the Texaco '152 and '486 skip-a-beat patents fifteen years before he examined the patents in suit precludes a finding that they were material.

5. 37 C.F.R. § 1.99 expressly provides a procedure for "updating of prior art statements."

June and July of 1982, or shortly thereafter, that the prior art disclosures in those applications were deficient and that the Neufeld '129 disclosure would be material to the PTO's examination of those applications. Notwithstanding Halliburton's testimony of its good faith belief, in light of all of the attendant circumstances, the evidence of Halliburton's gross negligence is sufficient to require this Court to find that Halliburton intended to mislead the PTO.

*Finding 17* Since Halliburton had actual knowledge of both the existence and materiality of the Neufeld '129 disclosures, the evidence establishes an inference of intent to mislead apart from the preceding finding, which is based on Halliburton's gross negligence. Beard's only explanation for failing to cite the Neufeld patent was that he never considered whether to cite it. This lack of consideration cannot be based on a lack of knowledge of the Neufeld '129 patent or its materiality since the facts unmistakably show that he was aware of the materiality of Neufeld. Under these facts, Beard's justification is both unpersuasive and inconsistent with his continuing duty of candor and disclosure under 37 C.F.R. § 1.56(a).

### C. *The Texaco Patents*

#### (1) Materiality and knowledge

*Finding 18* Each of the Texaco patents (Defendant's Exs. 5, 6, 7 and 8) discloses the key feature of the patents in suit, the use of the two-exponential equation to simultaneously obtain $\tau B$ and $\tau F$. (See, e.g., the '611 patent, Column 6, and equation (3)). The Texaco patents, like the Halliburton and Neufeld patents, recognize the advantages of measuring the borehole component of the decay curve. The Texaco patents describe this invention as an advance over prior timing out techniques. The Texaco patents are different from the patents in suit in that they use a harmonically intensity modulated source of fast neutrons instead of the pulsed source method claimed by the patents in suit. Never-

theless, since they disclose use of the two-exponential formula to simultaneously obtain $\tau B$ and $\tau F$, the Texaco patents are more material than the prior art cited by Halliburton or the prior art references selected by the examiner.

*Finding 19* Halliburton was aware of the materiality of the Texaco patents to the patents in suit. Dr. Arnold was one of the inventors of the Texaco '611 and '300 patents. Mr. Beard prosecuted all four of the patents when he and Dr. Arnold worked for Texaco before joining Halliburton. A comparison of the similarities in the language Beard used in drafting the Texaco '611 patent and the '444 patent in suit led Dr. Arnold (and this Court) to conclude that Beard used the '611 patent as a guide to draft the '444 patent.[6] Beard testified that he had no recollection of preparing the Halliburton applications and no notes or drafts of any of them.

In connection with an infringement search, in January of 1982 outside counsel sent Beard a lengthy list of "relevant art" concerning the proposed TMD system. (Defendant's Ex. 390). All four of the Texaco patents were on the list and three of them were noted as already being in Beard's files. Beard testified that after receiving this letter, he did not review the patents listed because Halliburton was then in the process of licensing various patents from Texaco. He testified that he later reviewed a group of patents on this list selected by his outside counsel, but that the Texaco (and Armistead) patents were not among this group.

#### (2) Intent to mislead

*Finding 20* Halliburton was grossly negligent in failing to disclose any of the Texaco patents to the PTO. A reasonable applicant's attorney, knowing (1) that his own outside counsel considered the Texaco patents to be material prior art to the TMD tool, (2) that he used one of the Texaco patents as a template for drafting the applications for the patents in suit, and (3) that in March and April of 1982 the examin-

---

**6.** Defendant's Ex. 406, which compares certain language of the two patents, is attached to this memorandum as Appendix 1.

er had not referenced any prior art that disclosed the key feature of Halliburton's invention, would have disclosed one or more of the Texaco patents to the PTO. Beard's statement that he "did not give conscious consideration as to whether to cite the Texaco patents during the preparation or prosecution of the Halliburton patents-in-suit" (Defendant's Ex. 138, para. 3), is inconsistent with the continuing duty to disclose material prior art to the PTO and with the contemporaneous evidence of materiality. In light of all of the attendant circumstances, the evidence of gross negligence is sufficient to require a finding of intent to mislead.

### D. *The Armistead '438 Patent*
#### (1) Materiality and knowledge

*Finding 21* Like the Halliburton patents, the Armistead '438 patent discloses measuring the entire neutron decay curve and analyzing it as the sum of two exponentially decaying borehole and formation components to decompose it into $\tau B$ and $\tau F$. (See Figures 9A, 9B and 10 and Column 13, Line 46 to Column 14, Line 10). However, because the primary method for decomposing the decay curve in Armistead involves solving for the components graphically, it is less material than the disclosures in the Neufeld '129 and the Texaco patents. Armistead is nevertheless more material than the commercial art disclosed by Halliburton or the patents referenced by the examiner, none of which disclosed this key feature.

*Finding 22* The Armistead '438 patent was listed as "relevant art" in the January 1982 letter to Beard (Defendant's Ex. 390) and was noted as being in Beard's files. This patent was also one of a number that Halliburton licensed from Texaco in negotiations that began in late 1981 and ended in March of 1983 with a License Agreement (Defendant's Ex. 97). Beard testified that he never reviewed the Armistead patent in connection with the Texaco negotiations or the clearance search and did not recall seeing it until this litigation. Although Beard was partially contradicted by the testimony of Harry Smith, a Halliburton physicist and one of the inventors of the Halliburton '481

patent, that Beard gave him a group of Texaco patents to review in connection with the Texaco license negotiations, there was no other evidence (such as discussed in the first paragraph of Finding 19 concerning the Texaco patents and in Findings 27 and 28 concerning the skip-a-beat patents) that Halliburton believed Armistead to be material.

#### (2) Intent to mislead

*Finding 23* Beard knew of the existence of the Armistead '438 patent and knew that his outside counsel considered it to be one of 150 prior patents that were relevant art in connection with an ongoing clearance search. Although a careful applicant might have reviewed all of these patents for possible relevance to the pending applications, and might have disclosed the Armistead '438 patent to the PTO, the failure of Halliburton to do so under these circumstances does not rise to the level of gross negligence or constitute evidence of intent to mislead.

### E. *The Skip–A–Beat Patents*
#### (1) Materiality and knowledge

*Finding 24* Halliburton's '444 patent contains claims (11–21) that relate to a method for simultaneously determining the borehole and formation components of thermal neutron decay, in which the normal repetitive emission of neutron bursts is periodically interrupted, or suppressed, for a fixed period of time during which background radiation is measured. The background count measurement is then subtracted from the decay curve count signals to correct them for background radiation. In the method described in the Halliburton '444 patent, neutron pulses are generated at the rate of 1,000 bursts per second. Gamma rays representing the thermal neutron population are detected by six time gates during the intervals between the first 945 bursts, and the neutron bursts are then suppressed for approximately 55 milliseconds. During the final 50 milliseconds of the suppression period the background count rate is measured and then subtracted from the thermal neutron population measurements made during the first 945 bursts

to correct them for background radiation. The '481 and '529 patents also incorporate this skip-a-beat feature (e.g., Claim 1 of the '481 patent, lines 52–59; Claims 7 and 8 of the '529 patent).

*Finding 25* The Texaco '486 patent (Defendant's Ex. 158) discloses a well logging technique in which neutron bursts are generated at the rate of 1,000 bursts per second, radiation representative of the thermal neutron population is detected during time gates between the first 985 bursts, and the bursts are then suppressed during the remaining 15 milliseconds of the operating cycle, during the last 10 milliseconds of which background radiation is measured. This background count is subtracted from the count signals obtained from the detection of radiation during the first 985 bursts of the operating cycle to correct those count signals for background radiation.

*Finding 26* The Texaco '904 patent (Defendant's Ex. 159) discloses a thermal neutron decay well logging tool in which neutron bursts are generated at the rate of 1,000 bursts per second, radiation representative of the thermal neutron population is detected in time gates during each of the intervals between the first 945 bursts, and the bursts are then suppressed for a fixed time period, during the last 50 milliseconds of which background radiation is measured. The background count is subtracted from the count signals generated from the earlier bursts to provide a correction for background radiation.

*Finding 27* The technique of suppressing neutron bursts to detect the background radiation in a thermal neutron decay time tool (as disclosed in the Texaco '486 and '904 patents) was well known to Halliburton's former Texaco employees prior to the filing of the applications for the patents in suit. Dr. Arnold was one of the inventors on both patents, and Mr. Beard prosecuted the '904 patent. This technique was referred to by them as the Texaco "skip-a-beat" technique. In their internal Halliburton Patent Disclosure Record (Defendant's Ex. 100) prepared in September of 1979, the inventors of the '444 patent expressly referred to the '486 patent as explaining a background subtraction method such as used in the '444 patent.

*Finding 28* Both of the skip-a-beat patents are listed as "relevant art" in the January 1982 letter to Beard. (Defendant's Ex. 390). In addition, the '486 patent is one of seven patents "identified as presenting potential infringement problems" in a later, June 15, 1982, letter from the same outside counsel to Halliburton "Re: Studies Concerning New Welex Pulsed Neutron Well Logging System...." (Defendant's Ex. 389). In 1982 when the TMD tool was being finalized, Smith was aware that the background technique it used was very similar to the technique disclosed in the skip-a-beat patents.

The skip-a-beat patents were among those licensed from Texaco in March of 1983 after eighteen months of negotiations. (Defendant's Ex. 97). Beard testified that neither he nor anyone else at Halliburton reviewed the patents to be licensed from Texaco during these negotiations because payments under the license agreement were based on use of the TMD tool rather than use of a particular Texaco patent. The Court does not find this testimony to be credible. Smith testified that he reviewed a group of Texaco patents and discussed with Beard the patents that he thought should be licensed. In addition, the fact that the license includes the Armistead and skip-a-beat patents, but not the '152, '611, '613, or '300 patents, is evidence that some conscious analysis and selectivity occurred during these negotiations. Finally, it defies common sense and experience that senior scientists and lawyers would negotiate a patent licensing agreement for eighteen months without ever reviewing the patents to be licensed.

*Finding 29* The skip-a-beat patents were material prior art, and the background subtraction technique they disclosed was not disclosed in the applications for the patents in suit and was not disclosed by the examiner's prior art references in the patents in suit. Although five of the six reference patents (all except the '590) did disclose a background subtraction feature, the technique they disclosed was significantly dif-

ferent from that disclosed in the patents in suit and the skip-a-beat patents.

### (2) Intent to mislead

*Finding 30* Given (1) the absence of any disclosure of the skip-a-beat background subtraction technique in the applications for the patents in suit, (2) the fact that the materiality of these patents was brought to Beard's attention by Arnold and Smith in the September 1979 Patent Disclosure Record (Defendant's Ex. 100) before the initial Halliburton applications were filed, (3) the fact that the '486 patent was one of seven of 150 patents expressly identified in June of 1982 as presenting possible infringement problems for the TMD tool (Defendant's Ex. 389), and (4) the fact that the skip-a-beat patents were the subject of licensing negotiations with Texaco culminating with a license agreement in March of 1983 (Defendant's Ex. 97), a reasonable applicant would have disclosed at least one of the two skip-a-beat patents in the initial applications for the patents in suit and certainly would have disclosed one of them when continuation applications were filed in June and July of 1982.

Beard testified that he did not cite these patents because he was unaware of them and testified that he never intended to act inequitably toward the PTO. In light of all of the contemporaneous evidence of Halliburton's awareness of the materiality of the skip-a-beat patents, Beard's testimony of ignorance and good faith intent is unpersuasive. Halliburton was grossly negligent in not disclosing the skip-a-beat patents, and the facts attendant to its gross negligence require a finding of intent to mislead.

### F. *Summary*

■ *Finding 31* There is clear and convincing evidence of the threshold level of materiality of the Neufeld '129 patent, the Texaco patents, the Armistead patent, and the skip-a-beat patents to the patents in suit.

*Finding 32* There is clear and convincing evidence that Halliburton, by its course of conduct, intended to mislead the PTO by not disclosing the Neufeld, Texaco, and skip-a-beat patents.

*Conclusion of Law 1* Balancing the evidence of materiality and intent, the Court concludes that Halliburton was guilty of inequitable conduct and that the claims in the patents in suit are unenforceable.

### ORDER

The Court ADJUDGES and DECREES that Patent Nos. 4,424,444, 4,388,529, and 4,409,481 are unenforceable.

## APPENDIX I

# U.S. Patent # 3,940,611

### Column 1, Line 30 to Column 1, Line 35

These neutron lifetime measurements have proven to be particularly valuable in evaluating earth formations in cased well boreholes. In both of these techniques a logging instrument which traverses the well bore uses a pulsed source of high energy or fast (14 MEV) neutrons.

### Column 1, Line 36 to Column 1, Line 52

In the first of these measurement techniques the neutron source is repetitively pulsed. For each fast neutron pulse, a cloud of fast neutrons is injected in a generally spherically symmetric fashion about the source to the surrounding earth formations. The fast neutron cloud passes from the well tool through the drilling mud, well bore casing, and cement between the casing and earth formations surrounding the well bore. Each such pulse of fast neutrons has approximately a constant intensity and lasts typically for a time duration of from 20 to 30 microseconds. This time lapse is generally adequate to create a thermalized (or low energy) neutron population in the earth formations and borehole. The number of thermal neutrons comprising this cloud or population then decays exponentially due to the capture of the thermalized neutrons by formation and borehole elemental nuclei.

### Column 1, Line 53 to Column 1, Line 61

After an initial time period, (about 300 microseconds) during which resultant gamma ray effects in the borehole, mud, and casing are substantially dissipated, measurements of the number of thermalized neutrons in the vicinity of the well tool are made during two successive time intervals and can be used to define an exponential decay curve for the thermal neutron population either in the borehole or the earth formation surrounding the borehole.

### Column 1, Line 67 to Column 2, Line 12

This assumption that the borehole component of thermal neutron decay time (or thermal neutron lifetime) is generally shorter than the formation thermal neutron decay time or thermal neutron lifetime usually occurs where drilling fluids having a high chlorine content (or salt water content) are encountered. However, in boreholes containing air, gas, fresh water or oil this relationship does not always hold. One striking advantage of the present invention over this prior art thermal neutron lifetime measuring technique is that no assumption is made as to the relative thermal neutron decay characteristic of the borehole fluid or with respect to that of the formations surrounding the borehole.

# U.S. Patent # 4,424,444

### Column 2, Line 13 to Column 2, Line 20

These commerical neutron lifetime (or thermal neutron decay time) measurements have proven to be particularly valuable in evaluating the producing potential of earth formations in the vicinity of cased well boreholes. In both of these presently available commercial techniques, a well logging instrument which traverses the wellbore uses a pulsed source of high energy (14 Mev) neutrons.

### Column 2, Line 22 to Column 2, Line 39

The first commercially available technique, at the present time is known as the "fixed gate" technique. In this technique, the neutron source is repetitively pulsed and for each neutron pulse a cloud of fast neutrons is injected in a generally spherically symmetric fashion about the source into the surrounding earth formations. The fast neutron cloud passes from the well tool through the drilling mud, wellbore casing, cement between the casing and the earth formation surrounding the wellbore and into the earth formations. In this technique, typically each such pulse of fast neutrons has approximately a constant intensity and lasts typically for a time duration of from 20 to 30 microseconds. The number of thermal neutrons comprising this cloud or population then decays exponentially due to the capture of the thermalized neutrons by nuclei in the earth formations and borehole.

### Column 2, Line 39 to Column 2, Line 51

After an initial time period following the neutron burst (typically about 300-400 microseconds), during which the resultant capture gamma ray distribution in the borehole, mud and casing is assumed to be substantially dissipated, measurements of the number of thermalized neutrons in the vicinity of the well tool are made during two successive time intervals or gates, of fixed duration. These two measurements made during the constant time gates or successive time intervals can then be used to define an approximately exponential decay curve for the thermal neutron population in the earth formation surrounding the borehole.

### Column 2, Line 56 to Column 3, Line 2

The assumption is that the borehole component of the thermal neutron decay or thermal neutron lifetime is generally shorter than the earth formation component of thermal neutron decay or thermal neutron lifetime. This usually occurs when borehole drilling fluids having a high chlorine or salt water content are encountered. However, in boreholes containing air, gas, fresh water or oil this relationship does not always hold. Accordingly, one particular advantage of the present invention over this "fixed gate" prior art thermal neutron lifetime measuring technique is that no assumption is made as to the relative thermal neutron decay time characteristics of the borehole fluid with respect to the thermal neutron decay time or lifetime characteristics of the earth formations surrounding the borehole.

## U.S. Patent # 3,940,611

### Column 2, Line 22 to Column 2, Line 28

These two time intervals or time gates, for example, can be fixed between 400–600 microseconds following the neutron burst, and between 700–900 microseconds following the neutron burst in typical earth formations, and under borehole conditions wherein a saline fluid or high chlorine content salt is present in the borehole fluid.

### Column 2, Line 29 to Column 2, Line 44

If neutron diffusion effects are ignored, the relationship for the decay of a thermal neutron population in a homogeneous medium having a thermal neutron macroscopic capture cross-section can be expressed as:

$$N_2 = N_1 e^{-\epsilon t} \qquad (1)$$

wherein $N_1$ is the number of thermal neutrons at a first point in time, $t_1$; $N_2$ is the number of thermal neutron at a later point in time, $t_2$; $e$ is the Naperian logarithm base; $t$ is the time between two measurements $(t_2 - t_1)$; and $v$ is the velocity of the thermal neutrons. The macroscopic thermal neutron capture cross section $\epsilon$ of a reservoir rock (which can be obtained from Equation (1) is dependent upon its porosity, the formation water salinity, and the quantity and type of petroleum contained in the pore spaces therein and thus is a valuable measurement to obtain.

### Column 2, Line 65 to Column 3, Line 9

A second prior art technique for measuring thermal neutron decay time or thermal neutron lifetime uses the reciprocal of the macroscopic thermal neutron capture cross section $\epsilon$ which is defined in terms of $\tau$ (the time constant for absorption of the thermal neutrons). A relationship analogous to Equation (1), but defined in terms of $\tau$ is given by:

$$N = N_0 e^{-t/\tau} \qquad (2)$$

where $\tau = 1/v\epsilon$

Here $N$ is thermal neutron density at any time $t$; $N_0$ is the thermal neutron density at an initial time $t_0$; $e$ is the Naperian constant, $\tau$ is the time required for the thermal neutron population to decay to $1/e$ of its value at $t_0$.

### Column 3, Line 18 to Column 3, Line 25

The value of $\tau$ previously measured is used to establish the neutron burst duration for the generation of the fast neutrons; the waiting interval to the opening to the first time gate, the duration of the first time gate, the duration of the time between the time gates and the duration of the second time gate. All of these times are related to $\tau$, as previously measured.

## U.S. Patent # 4,424,444

### Column 3, Line 9 to Column 3, Line 17

The two time intervals or gates most frequently used, for example, in the fixed gate technique for measuring thermal neutron decay times can occur between 400–600 microseconds following the neutron burst and between 700–900 microseconds following the neutron burst. These values are used in typical earth formations regardless of the salinity of the fluid present in the borehole.

### Column 3, Line 24 to Column 3, Line 43

If neutron diffusion effects are ignored, the relationship for the decay of a thermal neutron population in a homogeneous medium having a thermal neutron macroscopic capture cross-section $\Sigma$ can be expressed as in Equation 1.

$$N_2 = N_1 e^{-\Sigma(vt)} \qquad (1)$$

wherein $N_1$ is the number of thermal neutrons at a first point in time $t_1$; $N_2$ is the number of thermal neutrons present at a later point in time $t_2$; $e$ is the Naperian logarithm base; $t$ is the time between two measurements $(t_2 - t_1)$; and $v$ is the velocity of the thermal neutrons. The macroscopic thermal neutron capture cross section $\Sigma$ of a reservoir rock (which can be obtained from Equation 1) is dependent upon its porosity, matrix composition, shaliness, the formation water salinity, and the quantity and type of petroleum contained in the pore spaces therein. This quantity thus represents a valuable physical parameter or measurement of the formation to be obtained.

### Column 3, Line 44 to Column 3, Line 60

The second presently commercially available prior art technique for measuring thermal neutron decay time or thermal neutron lifetime uses a reciprocal relationship of the macroscopic thermal neutron capture cross-section $\Sigma$ which is defined in terms of $\tau$ the time constant for absorption of the thermal neutrons. A relationship analogous to Equation 1 but defined in terms of $\tau$ is given by:

$$N = N_0 e^{-t/\tau} \qquad (2)$$

where $\tau = 1/v\Sigma$. In Equation 2, $N$ represents the thermal neutron density at any time $t$; $N_0$ is the thermal neutron density at an initial time, $t_0$; $e$ again represents the Naperian logarithm base constant; and $\tau$ is the time required for the thermal neutron population to decay $1/e$ of its value at $t_0$.

### Column 4, Line 8 to Column 4, Line 17

The value of $\tau$ previously measured on the previous neutron burst cycle is used to establish the neutron burst duration for the generation of the fast neutrons as well as the waiting interval to the opening of the first time gate following the burst, the duration of the first time gate, the duration of the second time gate and the waiting interval between the initiation of the first and second time gates. All of these times are adjusted until a predetermined relationship to $\tau$ is satisfied.

## U.S. Patent # 3,940,611

**Column 3, Line 39 to Column 3, Line 49**

BRIEF DESCRIPTION OF THE INVENTION

In the present invention a well logging tool is moved through the borehole and includes an intensity modulated fast neutron source and a gamma ray detector (or, alternatively, a thermal neutron detector). A single such detector is used. The neutron source generates a generally harmonically varying population of fast neutrons as a function of time. These neutrons are introduced into the media surrounding the well borehole and result in a thermal neutron population being generated from the slowing down of the fast neutrons in the media and borehole itself.

**Column 4, Line 6 to Column 4, Line 16**

Novel electronic systems are provided in the downhole tool and at the surface for producing a sequence of different frequency intensity modulated fast neutron clouds operating at least at three different frequencies of operation. Synchronization (or sync) pulses are also generated and these provide a means for separating the counts of gamma rays representative of thermal neutrons during the portion of a measurement cycle corresponding to measurements made at each of the different frequencies of intensity modulation of the neutron source.

**Column 4, Line 25 to Column 4, Line 29**

Moreover, the invention includes techniques for determining the value of the thermal neutron decay time τ and/or the macroscopic thermal neutron capture cross section ε of both the media surrounding the borehole and the borehole fluid.

## U.S. Patent # 4,424,444

**Column 5, Line 3 to Column 5, Line 15**

BRIEF DESCRIPTION OF THE INVENTION

In the present invention a well logging tool is moved through the borehole and includes a pulsed source of fast neutrons and two radiation detectors. The neutron source generates a pulse of fast neutrons of approximately constant intensity for a duration of between 10 and 30 microseconds. These neutrons are introduced into the media comprising the well borehole and surrounding formations and result in a thermal neutron population being generated from the slowing down of the fast neutrons in the earth formation media and the borehole.

**Column 5, Line 48 to Column 5, Line 55**

Electronic systems are provided in the downhole tool and at the surface for producing the measurement sequence and neutron pulses as described. Additionally, synchronization or sync pulses are also generated to provide a means for separating the counts of gamma rays representative of thermal neutron capture during each of the six or more gating portions of the measurement cycle, as previously described.

**Column 5, Line 64 to Column 5, Line 68**

Thus, the system of the present invention includes techniques for determining the value of thermal neutron decay or macroscopic thermal neutron capture cross-section of the borehole and the surrounding media simultaneously.