Patrick R. DRISCOLL, Appellant,

v.

Tony CEBALO and Robert A. Walde, Appellees,

v.

Karl HOEGERLE, Hans Cellarius, Paul Rathgeb, and Jurg Rumpf, Appellees.

Tony CEBALO and Robert A. Walde, Appellants,

v.

Patrick R. DRISCOLL, Appellee,

v.

Carl METZGER, Ludwig Eue, and Helmuth Hack, Appellees.

Appeal Nos. 83–968, 83–654.
Interference Nos. 97757, 98208.

United States Court of Appeals, Federal Circuit.

April 6, 1984.

Donald A. Peterson, Chicago, Ill., argued for appellants. With him on brief were Kenneth R. Adamo and Herbert D. Hart, III, Chicago, Ill.; Leroy Whitaker, Indianapolis, Ind., of counsel.

Peter G. Dilworth, Garden City, N.Y., argued for appellee Driscoll. With him on brief were Stephen D. Murphy and Rocco S. Barrese, Garden City, N.Y.

Before DAVIS, Circuit Judge, NICHOLS,* Senior Circuit Judge, and MILLER, Circuit Judge.

JACK R. MILLER, Circuit Judge.

These consolidated appeals under 35 U.S.C. § 141 (1976) arose out of two interferences in which the Patent and Trademark Office Board of Patent Interferences ("board") awarded priority to Patrick R. Driscoll ("Driscoll") in Interference No. 98,-208 (one phantom count) and to Tony Cebalo and Robert A. Walde ("Cebalo") in Interference No. 97,757 (two counts). Both Cebalo and Driscoll appeal from the awards of priority in the respective interferences;

Driscoll also appeals from the board's dismissal of the fraud issue (belatedly raised in his brief below) in Interference No. 98,-208.

The dispositive issue is whether the party Cebalo violated his duty of disclosure owed the Patent and Trademark Office ("PTO") during prosecution of his series of applications involved in both interferences. Because, as we hold, Cebalo violated his duty, the board's decision in favor of Cebalo in Interference No. 97,757 must be reversed, and its decision in Interference No. 98,208 in favor of Driscoll must be affirmed.

*Interference No. 97,757*

The party Driscoll filed his patent application, Serial No. 113,679, on February 8, 1971, and was accorded the benefit of his earlier applications, Serial No. 702,189, filed February 1, 1968 (as to Count 1 only), Serial No. 782,756, filed December 10, 1968, and Serial No. 818,078, filed April 21, 1969, under 35 U.S.C. § 120. The junior party Cebalo filed two continuation-in-part applications (Serial Nos. 762,604, September 25, 1968, and 856,461, September 9, 1969) and was accorded the benefit of his earlier parent application, Serial No. 712,585, filed March 13, 1968, under 35 U.S.C. § 120.[1]

The subject matter of Interference No. 97,757 involves certain thiadiazole urea compounds having utility as herbicides. The two counts of the interference are directed to fluorinated organic compounds as follows:

1. A compound as defined in claim 1,[2] which is N-[5-trifluoromethyl-1,3,4-thiadiazolyl (2) ]-N'-methyl urea.

---

* Judge Nichols assumed senior status effective October 1, 1983.

1. The senior party Hoegerle et al. ("Hoegerle") filed his application, Serial No. 785,762, December 20, 1968, and was accorded the benefit of Swiss application No. 18,206, filed December 27, 1967, under 35 U.S.C. § 119 with respect to Count 2. Hoegerle relied solely on his foreign filing date, which was antedated by Cebalo's reduction to practice on May 12, 1967. Accordingly, as alternatively held by the board, "[w]ere there fraud on the part of Cebalo, ... priority would be awarded to Driscoll as to Count 1 and to Hoegerle as to Count 2, because Cebalo would not qualify as a party to this interference," even though Hoegerle has taken no part in this appeal. Hoegerle's assignee is Ciba-Geigy Corp. ("Ciba").

2. *Claim 1*

A compound of the formula

2. A compound as defined in claim 1, which is N-[5-trifluoromethyl-1,3,4-thiadiazolyl (2) ]-N, N'-dimethyl urea.

Driscoll filed a motion to strike the Cebalo application and to deny Cebalo the benefit of his earlier-filed application for violation of 37 C.F.R. § 1.56—specifically for fraud in withholding a prior art reference. Treating Driscoll's motion as a petition to strike pursuant to said rule, the Commissioner of Patents and Trademarks deferred action on the motion, on related ·oppositions, and on certain declarations, pending final decision by the board on the question of priority and all ancillary issues. The fraud issue was deemed by the board to be ancillary to priority and was briefed.

Claim 1 of Cebalo's parent application reads as follows:

Thiadiazolines having the structure

$$N_4 \text{———} _3 NH$$
$$A \text{—} C_5 \quad _2 C \text{==} NB$$
$$S_1$$

and tautomers thereof:

wherein A is a substituent selected from the group consisting of $C_1-C_7$ acyclic hydrocarbon radicals and halogenated derivatives of said radicals, wherein each halogen is independently selected from the group consisting of F, Cl and Br; and

B is a substituent selected from the group consisting of lower acyclic hydrocarbon radicals, phenyl, monosubstituted phenyl and poly-substituted phenyl wherein each substituent is independently selected from the group consisting of:
 (a) Cl
 (b) Br
 (c) –NO$_2$

(d) –CF$_3$
(e) a lower alkyl radical
(f) a lower alkoxy radical, and
(g) the group:

wherein each D represents an independently selected lower alkyl radical.

Thus, claim 1, as originally filed, encompasses compounds in which the 5-position of the heterocyclic ring is substituted with either a nonfluorinated *alkyl group* (which includes a lower alkyl group) or a fluorinated alkyl group. The compounds encompassed by claim 1 and having a fluorinated alkyl group serve as key starting materials for the compounds of the counts of Interference No. 97,757, and the compounds having a nonfluorinated alkyl group serve as key starting materials for compounds of the single phantom count of Interference No. 98,208.

In the "Prior Art" section of the application, Cebalo disclosed two references: J. Pharm. Soc. Japan 74, 1044–8 (1954), which discloses "somewhat related compounds" such as 1-(5-methyl-1,3,4-thiadiazol-2-yl)-3-phenylurea, and an article in Farmaco Ed. Sci. 22(6), 393–401 (1967), which "discloses the use of 1-(5-alkyl-1,3,4-thiadiazol-2-yl)ureas as intermediates for the production of isomeric 1,3-bis-(5-alkyl-1,3,4-thiadiazol-2-yl)ureas."

Cebalo did *not* cite Canadian Patent No. 745,623, issued November 1, 1966 ("Canadian patent"), which discloses "agents for combating pests especially weeds and phytopathogenic microorganisms" containing a compound of the general formula:

$$N \text{———} N$$
$$R_1 \diagdown S \diagup \quad N \text{—} C \text{—} N \diagup ^{R_3}_{R_4}$$
$$R_2 \quad O$$

wherein
 $R_1$ represents a perfluoroalkyl radical of from 1 to 2 carbon atoms,

 $R_2$ represents hydrogen or lower alkyl,
 $R_3$ represents hydrogen or lower alkyl, with the proviso that at least one of the symbols $R_2$ and $R_3$ represents hydrogen, and
 $R_4$ represents a lower alkyl radical any substituent of which is selected from chlorine, bromine, cyano, lower alkoxy, lower alkylthio; alkenyl of from 3 to 4 carbon atoms, alkinyl of from 3 to 4 carbon atoms, cycloalkyl of from 3 to 6 carbon atoms, and lower alkoxy.

$$R_1-N=C<\begin{matrix}\overset{R_3}{N}-N\\ | \quad\quad \|\\ \quad\quad C-R_2\\ S\end{matrix} \quad (I)$$

or of the isomeric formula

$$R_1-N-C<\begin{matrix}N-N\\ \| \quad\quad \|\\ \quad\quad C-R_2\\ S\\ |\\ R_3\end{matrix} \quad (II)$$

where $R_1$ is a phenyl radical which may be substituted by a lower alkyl radical or by the group $-CF_3$, or a saturated or unsaturated, preferably lower, aliphatic radical; $R_2$ represents a hydrogen atom or a lower alkyl radical, or a phenyl radical which may be substituted by at least one, preferably lower, alkyl or alkoxy group, at least one halogen atom (preferably a chlorine, bromine or fluorine atom), or by at least one $-NO_2$, $-CF_3$ or $-N<\begin{matrix}A\\ A'\end{matrix}$, group (in which A and A' each represents a hydrogen atom or a lower alkyl radical); and $R_3$ stands for a hydrogen atom or a preferably lower alkyl radical or for the radical R–CO– (where R is a preferably lower alkyl radical), or a salt or quaternary ammonium compound thereof . . . .

It is clear that the Canadian patent discloses compounds in which the 5-position of the ring is substituted with, *inter alia,* a nonfluorinated lower alkyl group.

An employee with the Patent Department of Cebalo's assignee prepared a 15-page "Art Search" report, dated August 3, 1967, which stated that "[t]he principal references are to Ciba's Canadian [i.e., the Canadian patent] and Belgian 2,5-substituted thiadiazole patents ...." The report discussed the relevance of the Canadian patent as well as the fact that it specifically sets forth the following compound, in which the 5-position is substituted with a nonfluorinated methyl group:

$$CH_3-C<\begin{matrix}N-N\\ \| \quad\quad \|\\ \quad\quad C-N<\begin{matrix}H\\ \end{matrix}-\text{(phenyl)}\\ S\end{matrix}$$

[Example 2(a) of the Canadian patent.]

After some input from the inventors, Cebalo's attorney prepared a draft application, including claim 1, encompassing compounds having either a fluorinated or non-fluorinated alkyl group in the 5-position of the heterocyclic ring, and forwarded it to Doctor Cebalo for review on February 12, 1968. Doctor Cebalo returned the draft application to the attorney about ten days later with the following note on Claim 1:

Note [blur] A good deal of what we claim here is claimed in the attached sheets from Canadian Patent 745,623.

Doctor Cebalo later testified that he then realized that "a good deal of the compounds" disclosed by the reference could not be tautomerized, as he at first had believed, and, "[t]herefore, I came to the conclusion that the patent was inoperable, and, therefore, I concluded that it was not a valid reference and it need not be considered." Doctor Cebalo's co-inventor (Walde) testified to the same effect. However, Doctor Cebalo admitted under cross-examination that Example 2(a) (the compound shown above) of the Canadian patent was included within the scope of claim 1 of the parent Cebalo application. Claim 1 was not substantially changed by the Cebalo attorney before filing and was carried forward into Cebalo's two subsequent continuation-in-part applications. The parent and the first continuation-in-part application were permitted to become abandoned in response to requirements for restriction with no prosecution on the merits. During prosecution of the second continuation-in-part (the application involved in the interference below and containing claim 1), the claims were rejected for double patenting, reciting duplicates, and failing to define the invention with the definiteness required by 35 U.S.C. § 112.

At this point, a new attorney was assigned to handle the Cebalo application and, after an interview with the examiner,

claim 1 was cancelled. By an amendment of April 6, 1970, claim 41, setting forth a narrower group of compounds, all of which serve as starting materials for the compounds of the counts and in which the 5-position can only be substituted with a fluorinated alkyl group, was substituted for claim 1:

41. Thiadiazoles having the structure:

and tautomers thereof:

wherein A is a $C_1$–$C_7$ haloalkyl radical, wherein each halogen is independently selected from the group consisting of F, Cl, and Br; and B is selected from the group consisting of lower alkyl and lower alkenyl radicals.

The Canadian patent was, again, *not* cited to the PTO in the amendment of April 6, 1970, notwithstanding that some of the compounds of claim 41 differ by as little as one fluorine atom from compounds disclosed by the Canadian patent and that some of the latter are herbicidal analogs of some of the former. *See In re Albrecht,* 579 F.2d 92, 94, 198 USPQ 208, 209 (C.C.P. A.1978); *In re Widmer,* 353 F.2d 752, 757, 53 C.C.P.A. 762, 147 USPQ 518, 523 (1965). Prosecution of claim 41 on the merits ended when this interference was declared.

In response to Driscoll's motion to strike the Cebalo application for fraud and to deny Cebalo the benefit of his earlier-filed parent application, Cebalo submitted a declaration of his new attorney stating that, in a memorandum summarizing a conference with Doctor Cebalo, he had referred to the fact that the generic structure of the thiadiazoles set forth in claim 1 "could possibly conflict with known prior art"; that he had added to the memorandum the further notation: "Tony [Cebalo] to send art. Possibly cancel Cls. 1–7 not patentable"; that he filed an amendment canceling claim 1 and substituting therefor claim 41 which defined the substituents "A" and "B" in narrow terms; and that so amending the

claim "clearly avoided and still avoids any possible conflict with all known and material prior art, including inter alia the Canadian patent." Doctor Cebalo testified that he thought that the claim was amended to exclude everything that was in the Canadian patent and that the purpose of the amendment was that "there wouldn't be any possibility of having any overlap or infringing on the prior art."

In its opinion of September 21, 1982, the board concluded that the Canadian patent would have been material to claim 1; that "any reasonable examiner would have rejected the Claim as being unpatentable over The Reference"; and that there was gross negligence, "if not specific intent to deceive," in carrying out Cebalo's duty of disclosure to the PTO. However, the board found that there was no reliance by the PTO because neither claim 1, nor substitute claim 41, had been allowed by the PTO. Cebalo was awarded priority on both counts.

Following the board's decision, Driscoll renewed his motion to strike Cebalo's patent application under 37 C.F.R. § 1.56, maintaining that the board's findings of materiality and gross negligence were sufficient for a holding that Cebalo committed attempted fraud or inequitable conduct proscribed by 37 C.F.R. § 1.56. Cebalo filed an opposition, and the board forwarded the motion to the Commissioner of Patents and Trademarks for his consideration. The renewed motion was denied by the Deputy Commissioner with the following discussion:

Since former Deputy Commissioner Parker entered the decision (Paper No. 153) denying Driscoll's first motion to strike without prejudice to renewal, the provisions of 37 CFR § 1.56 have been amended. Under current practice, if the inequitable conduct set forth in 37 CFR § 1.56(d) is determined to have occurred, the examiner enters a rejection. Patent applications are no longer stricken for fraud.

Driscoll filed a request for reconsideration of the Deputy Commissioner's order and Cebalo opposed. The Deputy Commissioner, on reconsideration, denied Driscoll's renewed petition to strike, but did so without prejudice to renewal after a final decision was entered in the interference. The Deputy Commissioner withdrew from his former position that the Commissioner no longer had authority to strike applications, but stated:

> Fraud issues are ancillary to priority and are resolved by the Board along with other issues in determining priority. In the recent past, it has been the practice of the PTO to defer rulings on petitions to strike until the Board rules on any fraud issues at final hearing. It is implicit from former Deputy Commissioner Parker's decision that such a ruling should be made by the Commissioner—if it is to be made at all—only after a decision in the interference is final (either because no appeal is filed or, if an appeal is filed, when the decision on appeal becomes final).

It was also the Deputy Commissioner's position that, once a decision in the interference becomes final, "the Commissioner may then decide what further action—if any—might be taken under applicable PTO rules *consistent with the final decision in the interference*, whether entered by the Board or a reviewing court." (Emphasis in original.)

### Interference No. 98,208

Cebalo filed his patent application, Serial No. 178,379 on September 7, 1971, and again was awarded the benefit of his earlier application Serial No. 712,585 (including the above-discussed Claim 1) filed March 13, 1968.

Driscoll was involved in this interference on the basis of the same application (Serial No. 113,679, filed February 8, 1971) as in Interference No. 79,757 and was accorded

the benefit of the same earlier-filed applications (Serial Nos. 818,078 filed April 21, 1969, and 702,189 filed February 1, 1968) under 35 U.S.C. § 120.[3]

The subject matter of this interference is also a class of compounds having utility as herbicides. However, unlike the counts in Interference No. 79,757, the single phantom count in Interference No. 98,208 encompasses only *non*fluorinated compounds, as follows:

A compound of the formula

wherein X = oxygen or sulfur,
R = alkyl,
$R_1$ = alkyl, and
$R_2$ = alkyl or hydrogen.

As related earlier, Driscoll belatedly raised the issue of fraud (by Cebalo in failing to bring the Canadian patent to the attention of the PTO) in his brief before the board, not having previously submitted a motion to dissolve under 37 C.F.R. § 1.231. The board found that the facts regarding the Canadian patent were not known by Driscoll until after the discovery period. Driscoll then filed a motion to strike pursuant to 37 C.F.R. § 1.56, which, the board said, could have been treated as "tantamount to a timely § 1.231 motion" (as was the motion to strike in Interference No. 97,757), except for the fact that the motion to strike was directed to conduct by Cebalo other than the withholding of the Canadian patent. The board held that Driscoll was not, for the first time at final hearing, entitled to raise matters not included in his *motion to strike*, because there was no adequate showing why the issue could not have been earlier raised.

---

**3.** The party Metzger et al. ("Metzger") filed U.S. application Serial No. 230,461 on February 29, 1972, and was accorded the benefit of its Federal Republic of Germany application Serial No. F 53531 filed on September 19, 1967. Metzger relied solely on his foreign filing date under 35 U.S.C. § 119, but this was antedated by both Cebalo and Driscoll. Metzger takes no part in this appeal.

The board recognized its discretion to consider the fraud issue "to prevent manifest injustice," but declined to do so for the following reason:

> We have already decided in the other interference, on the precise facts presented, that fraud did not lie against Cebalo.

## ANALYSIS

 "Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO." *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383, 217 USPQ 1281, 1286 (Fed.Cir.1983); *Square Liner 360°, Inc. v. Chisum*, 691 F.2d 362, 374, 216 USPQ 666, 674–75 (8th Cir.1982). Where, as in this case, a patent has not been issued, the same standard of proof applies with respect to the proceedings before the PTO. *Norton v. Curtiss*, 433 F.2d 779, 797, 57 C.C.P.A. 1384, 167 USPQ 532, 547–48 (1970).

 We agree with the board's conclusion in Interference No. 97,757 that the Canadian patent would have been material to claim 1 of the Cebalo application. Example 2(a) of that patent is clearly within the scope of claim 1. That claim 1 was canceled and claim 41 substituted for it did not, contrary to the declaration of Cebalo's attorney, render the Canadian patent immaterial to claim 41. As pointed out above, some of the compounds of the Canadian patent are herbicidal analogs of some of the compounds within claim 41. Thus, claim 41 would have been prima facie obvious from the Canadian patent. Accordingly, we hold that Cebalo's attempt to excuse

his failure to disclose the Canadian patent during prosecution of his parent application by substituting claim 41 for claim 1, without bringing his failure to disclose to the attention of the PTO, must fail. *See Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1559, 1571–72, 220 USPQ 289, 291–92, 301–02 (Fed.Cir.1983) (holding that intentional misstatements during a "whole sequence of copending applications" were not "cured" by the kind of disclosure made to the PTO before claims were allowed). That the counts of either interference may be patentable over the withheld prior art, as argued by Cebalo, is not relevant. What is relevant is that the board found that a reasonable examiner would have considered such prior art important in deciding whether to allow the parent application. 37 C.F.R. § 1.56(d) (1982).[4] *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362, 220 USPQ 763, 773 (Fed.Cir.1984).

In Interference No. 97,757, the board said:

> Accordingly, reprehensible as Cebalo's conduct may have been, and we consider it to be quite reprehensible, we are constrained to find no fraud because there was no reliance by the Examiner upon Cebalo's violation of his duty to disclose.

This was error. *See Rohm & Haas Co. v. Crystal Chemical Co.*, *supra*. Although the previously quoted regulation 1.56(d) was not in effect at the time claim 41 was substituted for claim 1 (April, 1970), we conclude that the regulation essentially represents a codification of the "clean hands" maxim as applied to patent applicants. *True Temper Corp. v. CF & I Steel Corp.*, 601 F.2d 495, 504 n. 9, 202 USPQ 412, 419 n. 9 (10th Cir.1979). *See Keystone Driller Co. v. General Excavator Co.*, 290

---

**4.** § 1.56 Duty of disclosure; fraud; striking or rejection of applications.

(d) No patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or gross negligence. The claims in an application shall be rejected if upon examination pursuant to 35 U.S.C. 131 and 132, it is established by clear and convincing evidence (1) that any fraud was practiced or attempted on the Office in connection with the application, or in connection with any previous application upon which the application relies, or (2) that there was any violation of the duty of disclosure through bad faith or gross negligence in connection with the application, *or in connection with any previous application upon which the application relies.* [Emphasis added.]

U.S. 240, 246–47, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933); cited, *inter alia*, in *Walker Process v. Food Machinery*, 382 U.S. 172, 176, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965), *Precision Co. v. Automotive Co.*, 324 U.S. 806, 819, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945), *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 595, 172 USPQ 323, 325 (3d Cir.1972), *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 594, 171 USPQ 650, 662 (7th Cir.1971), and *Norton v. Curtiss, supra* 433 F.2d at 792 n. 12; Miller, *Fraud on the PTO*, 58 J.PAT.OFF.SOC'Y 271, 284 (1976). We note that the *Official Gazette* of the PTO (Vol. 955, No. 4, Feb. 22, 1977) states that regulation 1.56 "codifies the existing Office policy on fraud and inequitable conduct, which is believed consistent with the prevailing case law in the federal courts."

Significantly, the board found that:

the totality of the circumstances surrounding the actions of Cebalo, in particular, counsel for Cebalo, evidence, if not specific intent to deceive, such a pattern of misrepresentation in the two applications as to amount to gross negligence in carrying out the duty of disclosure owed the PTO.

We are satisfied that the board's finding of gross negligence—in the sense of neglect of duty—is sufficiently supported by the evidence. The correspondence between the Cebalo attorneys and the inventors demonstrates full awareness of the materiality of the Canadian patent notwithstanding any temporary subjective belief of inoperability on the part of the inventors. Where they knew, or should have known, that the withheld reference would be material to the PTO's consideration, their failure to disclose the reference is sufficient proof of the existence of an intent to mislead the PTO. *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1152, 219 USPQ 857, 862 (Fed. Cir.1983).

■ Where a claim, the subject of gross negligence, could not have been allowed due to its cancellation, requiring proof of reliance by actual claim allowance by the PTO would be totally unrealistic. More-over, an applicant who, with gross negligence, has withheld from the PTO prior art material to a claim in a parent application should not be exculpated simply because, by fortuitous circumstances, the PTO has not reached the stage of allowing claims in a continuing application.

■ Cebalo argues that the Belgian and U.S. counterparts of the Canadian patent were among the references included within the scope of the PTO's search and that there is a presumption that an examiner is aware of all prior art present in the classes and subclasses he searched, citing *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1579, 219 USPQ 8, 11 (Fed.Cir.1983). However, in *Richdel* this court merely held that it was error for the trial court to have required a patentee to prove that prior art had been considered by the PTO in order to preserve the presumption of validity granted by 35 U.S.C. § 282, because the statute imposes on his adversary the burden of proving facts necessary to a conclusion of invalidity. *Richdel* does not speak to the question of whether an examiner's search of an art class containing a certain reference leads, as a matter of law, to the presumption that the reference was discarded by the examiner as irrelevant. It cannot be presumed, where fraud or other egregious conduct is alleged, that the PTO considered prior art of particular relevance if it was not cited.

The board's decision awarding priority to Cebalo in Interference No. 97,757 is *reversed and remanded* for further proceedings consistent with this opinion. The board's decision awarding priority to Driscoll in Interference No. 98,208 is *affirmed.* Thus, its refusal to consider the fraud issue in Interference 98,208 amounted to harmless abuse of discretion.

AFFIRMED; REVERSED; AND REMANDED.