PAULINE NEWMAN, Circuit Judge,
dissenting.
“Inequitable conduct” in patent practice means misconduct by the patent applicant in dealings with the patent examiner, whereby the applicant or its attorney is found to have engaged in practices intended to deceive or mislead the examiner into granting the patent. It is a serious charge, and the effect is that an otherwise valid and invariably valuable patent is rendered unenforceable, for the charge arises only as a defense to patent infringement.
As this litigation-driven issue evolved, the law came to demand a perfection that few could attain in the complexities of patent practice. The result was not simply the elimination of fraudulently obtained patents, when such situations existed. The consequences were disproportionally pernicious, for they went far beyond punishing improper practice. The defense was grossly misused, and with inequitable conduct charged in almost every case in litigation, judges came to believe that every inventor and every patent attorney wallowed in sharp practice. This history was recently summarized as follows:
As is known, about 20 years ago inequitable conduct was frequently pleaded as a defense to patent infringement; a patent that is “unenforceable” due to a finding of inequitable conduct is dead. The defense was so misused by alleged infringers that the Federal Circuit once called this defense a “scourge” on U.S. patent litigation .... The famous Kings-down seemed to put a stop to the defense of inequitable conduct....
Michael D. Kaminski, Effective Management of U.S. Patent Litigation, 18 Intell. Prop. & Tech. L.J. 13, 24 (2006) (footnote omitted) (citing Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867 (Fed.Cir.1988) (en banc in relevant part)).
My colleagues on this panel have regressed to that benighted era, rejecting the efforts of Kingsdown to bring objectivity to charges of inequitable conduct, instead reviving the culture of attack on inventor rights and attorney reputations based on inference and innuendo. My colleagues, endorsing several novel and unsupportable presumptions of wrongdoing, do injury to the reasonable practice of patent solicitation, even as they defy the rules of summary judgment.
This is not hyperbole. Practitioners from an earlier era well recall the adverse impact on industrial innovation when patents were not a reliable support for commercial investment, based in part on the judicial belief that patents and their practice were seriously flawed. With invalidation of most of the patents that reached the courthouse, the contribution of a di *1196 minished patent incentive to the weakening of technology-based investment was a serious national concern, and the impact on the nation’s commercial vigor was recognized by government as well as by the industrial and scientific communities. See Domestic Policy Review of Industrial Innovation, Final Report, Dep’t of Commerce (1979). The formation of the Federal Circuit Court of Appeals was part of the nation’s program to restore technology-based leadership with the aid of an effective patent system.
The Federal Circuit recognized that specious charges of inequitable conduct were a disincentive to technologic innovation, and in Burlington Indus. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed.Cir.1988) this court remarked that “the habit of charging inequitable conduct in almost every major patent case has become an absolute plague.” The Federal Circuit understood the ease with which accused infringers could challenge the niceties of patent prosecution, for as the law stood it was irrelevant whether the examiner was in fact deceived, or whether the purported flaw in prosecution affected patentability, or whether the action was an intentional misrepresentation or at worst negligence, or whether the invention met the statutory requirements of patentability.[1] Thus the Federal Circuit undertook to bring objective standards and reasoned perspective to the charge of inequitable conduct.
In Kingsdown, the Federal Circuit held that in order to invalidate a patent for inequitable conduct in obtaining the patent, there must be both a material misrepresentation and intent to deceive. The court established that it is necessary to consider all of the evidence including evidence of good faith, and that both materiality and deceptive intent must be proved by clear and convincing evidence. Kings-down established that no longer would negligence alone support a holding of inequitable conduct. The Federal Circuit did not believe that inventors and patent attorneys are more or less virtuous than anyone else; they simply held that charges of deceptive action must be proved on objective standards, as the law requires for property-forfeiting charges under the common law. Experience shows that Kings-down ’s simple changes in the law were an important contribution to restoration of the patent system as an incentive to industrial innovation, for this court has recognized that a “ ‘patentee’s oversights are easily magnified out of proportion by one accused of infringement.’ ” Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 939 (Fed.Cir.1990) (quoting Pfizer, Inc. v. Int’l Rectifier Corp., 538 F.2d 180, 186 (8th Cir.1976)).
Today my colleagues on this panel not only ignore Kingsdown and restore a casually subjective standard, they also impose a positive inference of wrongdoing, replacing the need for evidence with a “should have known” standard of materiality, from which deceptive intent is inferred, even in the total absence of evidence. Thus the panel majority infers material misrepresentation, infers malevolent intent, presumes inequitable conduct, and wipes out a valuable property right, all on summary judgment, on the theory that the inventor “should have known” that something might be deemed material. The panel majority, *1197 steeped in adverse inferences, holds that good faith is irrelevant and presumes bad faith. Thus the court resurrects the plague of the past, ignoring the Kings-down requirements of clear and convincing evidence of a misrepresentation or omission material to patentability, made intentionally and for the purpose of deception. I respectfully, but urgently, dissent.

The Accused Conduct

The examiner, at an interview at'which the inventor Dr. Vilhardt was present, asked for “non-inventor” affidavits on the meaning of “peroral” and its significance to the claimed invention, apparently in accordance with the PTO custom that an inventor’s statements are not adequate.[2] The inventor strictly complied with this request, presenting statements of four distinguished scientists who were not inventors. The filing of the declarations of three of the affiants, Drs. Czernichow, Robinson, and Barth, is held by my colleagues to establish inequitable conduct simply because they did not state their past professional relationships with the applicant. These past affiliations are not clearly and convincingly material as a matter of law, and their omission does not establish clear and convincing evidence of deceptive intent as a matter of law.
Dr. Paul Czernichow was a world renowned pediatric endocrinologist, Professor of Pediatrics at the Hospital des En-fants-Malades, Paris, and had published 106 papers. The record states that Fer-ring had provided equipment used in a clinical trial that Dr. Czernichow had previously conducted at the hospital. He received no remuneration from Ferring for this trial, and was not paid for his affidavit. Although the majority makes much of his “extensive CV” that fails to mention the funding for the clinical trial, the majority fails to point out that 25 of the 28 pages of his CV list his publications, and the first 3 pages — where his qualifications, work experience and honors are listed— are organized such that one would not expect partial funding for a research project to appear. The most reasonable inference, to which Ferring is entitled on summary judgment, is that Dr. Czemi-chow’s relationship with Ferring was so remote as to not be worthy of a listing in his CV. Further, as my colleagues acknowledge, the summary judgment record contains no evidence that Dr. Vilhardt was aware of this prior relationship. Indeed, the only evidence on this issue is his answer upon being asked whether he knew whether Dr. Czernichow had been a Fer-ring consultant: “Not to my knowledge, no, but whether he had some kind of grant from Ferring I wouldn’t know, but I never heard him described as a consultant.”
Dr. Tomislav Barth was a Professor at the Academy of Sciences of the Czech Republic in the Department of Organic Chemistry and Biochemistry, with twenty-five years of experience in the fields of peptide biochemistry, metabolism, pharmacology and pharmacokinetics. The record states that Ferring had made research grants to the Czech Academy of Sciences, and that Dr. Barth worked on such projects, although he was not compensated by Ferring. Dr. Barth later did some experimental work for Ferring for “allowances and accommodation and costs,” but he was not engaged in such work at the time of his declaration and was not paid for his affidavit. There is no evidence in the summary judgment record that Dr. Vilhardt was aware of this prior affiliation, apart from his speculation during questioning *1198 that “it is possible that Tomislav Barth, who was a sort of contact person between Ferring and the department — the academy, that he may have obtained a small fee for that. I don’t know.”
Dr. Myron Miller was the Chief of Geriatric Medicine at the Veterans Administration Medical Center in Syracuse, New York, and had published 111 scientific papers. The record shows no research or employment relationship with the applicant, and none is asserted. Dr. Miller submitted two declarations, one to define “peroral” and one concerning gastrointestinal absorption. He was not paid for these statements.
Dr. I.C.A.F. Robinson, a neurophysiologist and an expert in neurophysin chemistry, was at the time of his declaration the head of the Division of Molecular Neuroen-docrinology at the National Institute for Medical Research in London; he held a doctorate in endocrinology from Oxford University and had published 161 scientific papers. Dr. Robinson worked for Ferring as director of pre-clinical research for one year from 1985-86, and as a paid occasional consultant until 1989. He too was not paid for his statements, and by the time of his 1990 declaration, his consulting relationship with Ferring had ended. His declaration was not submitted in response to the examiner’s request for “non-inventor” testimony in 1986; it was filed four years later, after the Board had affirmed the applicant’s interpretation of “peroral” and entered a new rejection based on obviousness.
In short, the summary judgment record consists of declarations by four respected non-inventor scientists, three of whom had a scientific relationship with Ferring, and Dr. Vilhardt knew of only one of these affiliations — Dr. Robinson’s affiliation that was omitted from a declaration submitted after the relationship ended and four years after the examiner’s request for “non-inventor” testimony. There is no evidence, or even an allegation, that any of these scientists had anything to gain or lose as a result of the issuance of the ’398 patent. The finding of the panel majority that all of the affiants had “intimate ties” with the patentee is a mischaracterization, and the inference that their scientific opinions may be biased and were submitted with deceptive intent is a travesty. Further, such a charge of malfeasance cannot be decided adversely on summary judgment. See generally IV Wigmore on Evidence § 1104 (3d ed.1957) (every witness is in law assumed to be of normal moral character for veracity). There is simply no evidence of any intention to withhold these relationships; in fact, there is no evidence that Dr. Vilhardt even thought about whether or not to disclose these affiliations, much less that he made the deliberate decision to withhold material information from the PTO. Indeed, the professors’ reputations are enough, on the face of their scholarship, to put into dispute the panel majority’s summary judgment that they deliberately concealed information that was important to the credibility of their affidavits.
Nonetheless, my colleagues, without inquiry or evidence, rule that deceptive intent must be inferred. The panel majority posits that the examiner was necessarily misled, and intentionally so, by the absence from their affidavits or curricula vitae of these relationships. The majority reaches this conclusion that clear and convincing evidence of materiality and intent are established, not upon considering and weighing the particular facts, but by adverse inference and presumption, on summary judgment. That is not the law of inequitable conduct, and it is not a reasonable application of any of the rules and protocols of evidence. See Baker Oil *1199 Tools, Inc. v. Geo Vann, Inc., 828 F.2d 1558, 1566 (Fed.Cir.1987) (“If facts of materiality or intent are reasonably disputed, the issue is not amenable to summary disposition.”)

Materiality

The issue here is not patent validity. The panel majority’s finding of “materiality” is not substantive scientific materiality, but materiality per se of the relationship of the affiant to the applicant. There is no evidence or assertion that any of the affi-ants mis-defined “peroral” or presented a false opinion, or that the examiner was deceived by the information provided or not provided, or that these scientists provided misinformation or deliberate omissions in order to deceive the examiner. There is no evidence that the examiner, in asking for the views of “a non-inventor,” was asking for or expecting the views of a stranger to the applicant.
The panel majority places great weight on the cases of Paragon Podiatry and Refac, where, on quite different facts, the court found deliberate misrepresentation of the relationship of an affiant for deceptive purposes. These cases do not support the sweeping inference now applied. In Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1188 (Fed.Cir.1993), materiality was not even at issue, the appellants having conceded that the examiner’s request for a “disinterested third party” was not met by declarations from former consultants owning stock in the assignee’s company. The affiants in Paragon not only failed to mention their stock ownership, but made the carefully worded statement that they were not “in the past employed by nor do I intend in the future to be employed by” the paten-tee. Id. at 1191. The court agreed that this “half-truth” was a material representation affecting the substantive content of the affidavits, and a deliberately artful contravention of the examiner’s requirement. Id. at 1192. And in Refac International, Ltd. v. Lotus Development Corp., 81 F.3d 1576, 1579 (Fed.Cir.1996) the relevant omitted material information was the declarant’s prior experience with the invention. The declarant in Refac stated that “he could have written” the claimed computer program “from the written disclosures and flow chart shown in the drawing of [the] patent application,” but failed to disclose that he “had worked with and reviewed documentation for the commercial embodiment of the invention” as an employee at the inventor’s company, and had “recognized the flow chart as being essentially the same one” shown to him during training at the company. Id. at 1581. In Refac the Federal Circuit upheld the ruling of inequitable conduct, but also cautioned that finding “the omission of an aspect of one’s employment history to be inequitable conduct might thus seem to be unduly severe, a heavy penalty for an arguably minor omission.” Id. at 1584.
The panel majority misreads these cases as holding that prior employment history is always material if (1) the declarant’s testimony is material and (2) the prior affiliation is “significant.” Given the minimal affiliations found “significant” in this case, and the majority’s holding that affidavits are always material, under the majority’s rule the negligent omission of a past affiliation with an applicant will always be inequitable conduct. Neither Paragon nor Refac supports a broad rule that past affiliations are always material, whatever those affiliations and whatever their relation to the subject matter. To the contrary, these cases were analyzed and findings made in accordance with the Eingsdown criteria. Materiality requires evidence, as does deceptive intent. The panel majority’s new per se rule is contrary to precedent, contrary to the rules of *1200 evidence, and contrary to reason, as is its assertion that the omitted relationships in this case are “highly material.” See Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1367 (Fed.Cir.2003) (“This court has held that affirmative misrepresentations by the patentee, in contrast to misleading omissions, are more likely to be regarded as material.”)
Paragon and Refac, like all precedent in this area, illustrate that questions of materiality and intent are factual in nature, and that per se inferences of bad faith and deception are improper. In Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728 (Fed.Cir.2002) this court agreed that the employment relationship of the declarant was not material to patentability, even though the applicant knew that the examiner had misunderstood the declaration as indicating that the declarant worked for a competitor. In Juicy Whip, as in Refac and Paragon, the court considered the particular facts with respect to both materiality and intent. In Refac, 81 F.3d at 1579, inequitable conduct was found in the declarant’s concealed prior experience with the invention, for his declaration stated that he “could have written” the claimed computer program from the specification alone. In Juicy Whip, in contrast, the misunderstood employment relationship was held by this court not to be material “to the issue before the examiner.” 292 F.3d at 744. The panel majority errs in characterizing Juicy Whip as holding that “the substance of an affidavit may be immaterial where the facts asserted therein were undisputed,” maj. op. at 1188 n. 8, for that was not the issue. Indeed, the court was “bothered” by the applicant’s failure to correct the examiner’s misunderstanding of the affiant’s relationship, but concluded that this aspect was “immaterial to the issue before the examiner.” 292 F.3d at 744.
Whether a past relationship between a declarant and the patent applicant is material to patentability depends on the facts of the relationship and the nature of the declaration. It is not per se material; and failure to explain the relationship is not per se deception. Indeed, it is rare that any scientist working in a specialized field would not have interacted professionally with other scientists and with the industries in that field. Such relationships do not warrant an inference of bias and deception. There must be evidence and analysis, not innuendo. Scientific integrity should not be impeached by per se rules without foundation.
On the facts of this case, where the declarants provided a text-book definition of “peroral” and their scientific opinion of the gastrointestinal behavior of the product, the past connections of these declar-ants do not establish per se material misrepresentation. “Information is material if a reasonable examiner would have considered it important to the patentability of a claim.” Regents of Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559, 1570, 1571 (Fed.Cir.1997) (“[Ujnfounded speculation is not clear and convincing evidence of materiality.”) The information in these affidavits was not shown to be incorrect. See Regents, 119 F.3d at 1570 (“There is no reason to believe that a reasonable examiner would have made any different decision .... ”). The fundamentals of due process should not and cannot be replaced by non-evidentiary inferences and unfounded speculation.

Intent

In cases involving an omission of material information, “there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference.” Baxter Int’l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329 (Fed.Cir.1998); see Scripps Clinic & Research *1201 Found. v. Genentech, Inc., 927 F.2d 1565, 1574 (Fed.Cir.1991) (“Conduct that requires forfeiture of all patent rights must be deliberate, and proved by clear and convincing evidence.”) Thus, to prevail on summary judgment, Barr must establish that no reasonable jury could fail to find clear and convincing evidence of deceptive intent. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
In its motion for summary judgment, Barr put forward no evidence of deceptive intent. Nonetheless, the majority holds that clear and convincing evidence of deceptive intent may be inferred on summary judgment where the record establishes that the applicant “knew or should have known” that omitted information was material. The majority’s ruling is directly contrary to Kingsdown, which held that even gross negligence may not establish deceptive intent, and that “the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.” 863 F.2d at 876; see Hewlett-Packard Co. v. Bausch & Lomb, Inc., 882 F.2d 1556, 1562 (Fed.Cir.1989) (“[Gjrossly negligent conduct may or may not compel an inference of an intent to mislead. Such an inference depends upon the totality of the circumstances ....”) Of course, dishonest persons rarely confess to malfeasance, but the court goes too far in establishing such deceptive intent as a matter of law based on inference as to what an inventor “should have known.” See Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181 (Fed.Cir.1995) (“the alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed .... In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference”).
The majority cites Bruno Indep. Living Aids and Critikon, Inc. to supports its proposition that the court has recognized
in cases such as Paragon, that summary judgment is appropriate on the issue of intent if there has been a failure to supply highly material information if the summary judgment record establishes that (1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information, and (3) the applicant has not provided a credible explanation for the withholding. See Bruno Indep. Living Aids, 394 F.3d at 1354; Critikon, Inc., 120 F.3d at 1257.
Maj. op. at 1191. That is an inaccurate summary of precedent. Paragon involved an affirmative misrepresentation, not an omission, and that case contains no suggestion of a “should have known” standard of materiality. See Paragon, 984 F.2d at 1192 (deceptive intent was established on summary judgment because the record only led to one conclusion upon considering all of the circumstances, including the fact that there was a “submission of deceptive, if not outright false, affidavits to the PTO”). And the court in Bruno Independent Living Aids, Inc. v. Acorn Mobility Servs. Ltd., 394 F.3d 1348 (Fed.Cir.2005) did not grant summary judgment, but rather affirmed a district court’s findings of deceptive intent on a standard of clear error, noting the high materiality of the omitted reference and the other particular facts of the case. The court’s statement in Bruno Indep. Living Aids that “ ‘an applicant who knew of the art or information cannot intentionally avoid learning of its materiality ... it may be found that the applicant ‘should have known’ of that materiality,’ ” 394 F.3d at 1352 (quoting FMC Corp. v. Manitowoc Co., 835 F.2d 1411, *1202 1415 (Fed.Cir.1987)), does not apply in this case, for there is no evidence or argument that Dr. Vilhardt deliberately avoided learning of the materiality of the undisclosed contacts. A fact-finder could not find that the applicant had knowledge of materiality, upon consideration of all the circumstances of record.
Nor was there a mere failure to disclose a known material reference in Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1257 (Fed.Cir.1997); the applicant in Critikon, Inc. also knowingly failed to disclose in reissue proceedings that invalidity and inequitable conduct were simultaneously being asserted as defenses in litigation involving the very same patent. Id. at 1255. And although the court stated that “intent may be inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO’s consideration of the patent application,” id. at 1256, this proposition was supported solely by reference to Driscoll v. Cebalo, 731 F.2d 878, 885 (Fed.Cir.1984), a case that was overruled en banc by Kingsdoum on this very point. See Kingsdoum, 863 F.2d at 876. Thus, this aspect of Critikon, Inc. has been correctly identified by practitioners as “bad law,” both because it relies on the overruled Driscoll decision and because it is representative of a recent resurgence of the plague that Kingsdoum had intended to cure.[3] See Lynn C. Tyler, Kingsdoum Fifteen Years Later: What Does It Take to Prove Inequitable Conduct?, 13 Fed. Cir. B.J. 267, 276-78 (2004) (discussing the resurgence of Federal Circuit panel decisions that rely on precedent explicitly overruled by Kingsdoum). Further, there is a wide gulf between a rule that intent “may” be inferred by a jury upon consideration of all the circumstances, in accordance with Kingsdoum, and a rule that intent “must” be inferred as a matter of law against a party opposing summary judgment, based solely on a material omission, in violation of Kings-doum and in violation of the rules of summary judgment.
Although some recent panel decisions appear to have relied on precedent overruled by Kingsdoum, such decisions cannot overrule an en banc decision of this court, or the numerous post-Kingsdoum cases that have held fast to the requirement of clear and convincing evidence of both materiality and intent. See, e.g., Hoffmamu-La Roche, 323 F.3d at 1361 (“the district court committed clear error in finding clear and convincing evidence of intent to deceive in the inventors’ failure to disclose”); Allen Eng’g Corp. v. Barbell Indus., 299 F.3d 1336, 1351 (Fed.Cir.2002) (rejecting argument that nondisclosed information was so material that its nondisclosure should infer an intent to deceive, “for even if [the applicant’s] conduct amounted to gross negligence, this alone would not be sufficient to show the requisite intent”); Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1289 (Fed.Cir.2002) (“ ‘intent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent’ ”) (quoting Hebert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed.Cir.1996)); Jazz Photo Corp. v. Int’l Trade Comm’n, 264 F.3d *1203 1094, 1110 (Fed.Cir.2001) (“absence of a reference from the prosecution record does not prove deceptive intent; there must be evidence sufficient to show, clearly and convincingly, the intent to withhold material information in order to deceive or mislead the examiner”); Molins, 48 F.3d at 1181 (“the alleged conduct must not amount merely to the- improper performance of, or omission of, an act one ought to have performed. Rather, clear and convincing evidence must prove that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, viz., misleading or deceiving the PTO”); Therma-Tru Corp. v. Peachtree Doors Inc., 44 F.3d 988, 996 (Fed.Cir.1995) (intent to deceive or mislead should not be inferred from the fact that information was not provided to the examiner); Halliburton Co. v. Schlmnberger Tech. Corp., 925 F.2d 1435, 1443 (Fed.Cir.1991) (“As Kingsdoum made abundantly clear, gross negligence alone does not compel the inference of intent to deceive. Gross negligence cannot elevate itself by its figurative boot-straps to an intent to mislead based on the identical factors used to establish gross negligence in the first instance unless all the facts and circumstances indicate sufficient culpability.”); Allen Organ Co. v. Kimball Int’l, Inc., 839 F.2d 1556, 1567 (Fed.Cir.1988) (“Materiality does not presume intent, which is a separate and essential component of inequitable conduct.”)
Numerous cases affirm the principle that inequitable conduct requires consideration of the record as a whole», including evidence of good faith. See, e.g., Warner-Lambert Co. v. Teva Pharms. USA, Inc., 418 F.3d 1326, 1348 (Fed.Cir.2005) (“there is no bright line test for determining whether inequitable conduct occurred; each case must be assessed independently”); Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368, 1383 (Fed.Cir.2000) (“Under all the circumstances of record, the court did not seriously misjudge the import of the evidence ... in reaching the conclusion that equity warranted rendering the patent unenforceable.”); Upjohn Co. v. MOVA Pharm. Corp., 225 F.3d 1306, 1312 (Fed.Cir.2000) (“Both materiality and intent to deceive must be proven by clear and convincing evidence.”); Refac, 81 F.3d at 1584-85 (recognizing the importance of credibility findings in evaluating intent).
Heretofore, no case has found inequitable conduct based on omitted information when there was no evidence of intentional omission and not even circumstantial evidence of deceptive intent. The panel majority’s holding that deceptive intent is established as a matter of law if the applicant “should have known” that information might be material to patentability, further revives the “plague” of the past, with burdens that far outweigh any conceivable benefits.

Summary Judgment

The court not only creates a new rule of law, but faults the patentee for failing to provide, on the summary judgment record, evidence to respond to an unknown “should have known” per se rule that until now was absent from this law. It is improper, and unfair, to require nugatory evidence on a point that was not raised in the motion for summary judgment, and then to grant the motion because the balancing evidence was not there. The panel majority not only charges the inventor Dr. Vilhardt with at least negligence, but denies him the opportunity now to respond to the court’s creative new ruling. Although in Therma-Tru Corp., 44 F.3d at 996, this court stated that the “theory of inferential culpability was definitively laid to rest in Kingsdoum,” if it is to be revived the *1204 inventor must be given the opportunity to support his good faith.
In Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Court cautioned against the grant of summary judgment when “motive and intent play leading roles,” for:
It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of “even handed justice.”
368 U.S. at 473, 82 S.Ct. 486. This court has often held similarly, for intent to deceive is a question of “the state of mind of one making representations,” KangaROOS U.S.A., Inc., v. Caldor, Inc., 778 F.2d 1571, 1576 (Fed.Cir.1985), a “factual matter rarely free from dispute,” id. at 1577, and thus “rarely enabled in summary proceedings.” Id.; see Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 1241 (Fed.Cir.2004) (“It was therefore improper for the district court on summary judgment to infer an intent to deceive based on the court’s conclusion that the declaration was false and that the explanation for the falsity was unpersuasive.”); Copelands’ Enters., Inc. v. CNV. Inc., 945 F.2d 1563, 1567 (Fed.Cir.1991) (“As a general rule, the factual question of intent is particularly unsuited to disposition on summary judgment.”)
For summary judgment of inequitable conduct there must be clear and convincing evidence of materiality and deceptive intent, even on the non-movant’s view of the facts. In this case, credibility has been placed at issue. The panel majority improperly draws adverse inferences against the party opposing summary judgment, inferring (1) that when the examiner requested “non-inventor” declarations, he expected experts who had no relationship with Ferring; (2) that Dr. Vilhardt understood that to be the examiner’s request; and (3) that when Dr. Vilhardt contacted these distinguished scientists and obtained their affidavits — an act my colleagues characterize as “completely natural” — he and Ferring deliberately concealed their past connections, with the intent to deceive the PTO. The Supreme Court has reiterated that “Summary judgment in favor of the party with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.” Hunt v. Cromartie, 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).
The panel majority holds that “to create a genuine issue, the appellants bore the burden of submitting an affidavit from Vil-hardt to contradict the movant’s evidence of intent.” Maj. op. at 1192. Setting aside the fact that the movant did not put forward any evidence of intent, there is no requirement in law that the non-movant submit an affidavit in opposing summary judgment. Ferring was free to rely on other more reliable forms of evidence, such as deposition testimony. See Fed.R.Civ.P. 56(c); 10A Charles A. Wright, Federal Practice and Procedure § 2722 p. 373 (3d ed. 1998) (“Because a deposition is taken under oath and the deponent’s responses are relatively spontaneous, it is one of the best forms of evidence for supporting or opposing a summary-judgment motion.”) In its response to the motion for summary judgment, «Ferring stated that Dr. Vilhardt had never considered one way or another whether to include the omitted information, and pointed to Dr. Vilhardt’s deposition testimony that he had “no idea” whether the patent office had asked for declarations from persons other than the inventors, and further that he had selected these scientists because they were “knowl *1205 edgeable and connected to the field as to give a qualified opinion on the matter.” See Anderson, 477 U.S. at 257, 106 S.Ct. 2505 (to establish a genuine issue of material fact, the nonmoving party “need only present evidence from which a jury might return a verdict in [its] favor”). The panel majority’s repeated assertions that Fer-ring “offered nothing” and that there was “no record evidence” to support its position are untenable, as are the credibility inferences it draws from Dr. Vilhardt’s deposition testimony.[4] See Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (the task of weighing the credibility of witnesses is for the trier of fact); Hunt, 526 U.S. at 552, 119 S.Ct. 1545 (the district court erred in granting summary judgment, in that “it either credited appellees’ asserted inferences over those advanced and supported by appellants or did not give appellants the inference they were due”).
At a minimum, the issue should be remanded, on correct law. It is not the law that a declarant’s past affiliations are always material, and it surely is not the law that “should have known” establishes deceptive intent, which requires scienter and deliberateness. On its face, “the involved conduct, viewed in light of all the evidence,” does not “indicate sufficient culpability to require a finding of intent to deceive,” the standard of Kingsdoum, 863 F.2d at 876. It is improper to convict this inventor of fraudulent conduct based on inference, on summary judgment. That is not the law, and it is not a just procedure.

. An examiner later dismissed the requested declarations defining "peroral,” stating that "such evidence is not necessary to construe the meaning of an ordinary term in the English language.”

. Indeed, the panel majority's citation to Digital Control Inc. v. Charles Mach. Works, 437 F.3d at 1313-17, 2006 WL 288075, 2006 U.S.App. LEXIS 2991 (Fed.Cir. Feb. 8, 2006) is a further indication of the court's departure from precedent concerning inequitable conduct. The court in Digital Control holds, in contradiction of precedent, that it will hold practitioners to the standard of the pre-1992 version of Rule 56 for patents prosecuted after 1992, even though that standard no longer exists. 437 F.3d at 1313-16, 2006 WL 288075, 2006 U.S.App. LEXIS 2991, at NO-19.

. My colleagues draw an adverse inference because Dr. Vilhardt initially did not recall the contacts, seventeen and thirteen years earlier, with the scientists concerning these affidavits. After being shown file correspondence indicating such contacts, Dr. Vilhardt explained that he had not recalled these contacts, had not understood what the questioner had meant by the term "affidavit” and that, while he didn't "remember distinctly what happened in those days,” he believed that most of the correspondence was handled by the attorneys.